## Case No. 4,225.

DYER et al. v. NATIONAL STEAM NAV. CO.

[14 Blatchf. 483;[1] 24 Int. Rev. Rec. 198.]

Circuit Court, E. D. New York. June 12, 1878.[2]

[1] [Reported by Hon. Samuel Blatchford, Circuit Judge, and here reprinted by permission.]
[2] [Affirming and modifying Cases Nos. 4,224 and 4,226.]

Scudder & Carter, for the ship.
Prichard & Smith, for the cargo.
Benedict, Taft & Benedict, for the passenger.
Butler, Stillman & Hubbard, for the steamer.

BLATCHFORD, Circuit Judge. The evidence is entirely satisfactory that the steamer was wholly in fault for this collision, and that the ship was free from fault. The wind was from northwest to north-northwest. The ship was closehauled on the wind, and heading a little south of west. The steamer was heading in such manner that her course crossed the course of the ship at an angle of about two points. The ship showed her green light to the steamer, and the steamer saw that light, and no other light, on the ship, and saw that light a little over the port bow of the steamer. The steamer showed her masthead light and her red light to the ship, and the ship saw those lights, and no other lights, on the steamer, and saw those lights a little over the starboard bow of the ship. The steamer saw the ship's light at a sufficient distance off to have avoided her, and yet the steamer ported and persistently ported, although the ship's light continued to draw towards the bow of the steamer and was not shaken off, as the result of the steamer's porting; and, in spite of the danger which this condition of things indicated, the steamer did not slow, or stop and reverse, until just before the collision. Her speed was so great, when she struck the ship, that she cut off entirely the forward part of the ship and passed some distance beyond her. The ship did not change her course before a collision was inevitable, and it is doubtful whether she changed it even then. She made no change which contributed to the collision or embarrassed the steamer's freedom of action. The answer charges, as faults on the part of the ship, that she had no lookout, and was not properly manned and navigated, and changed her course. No one of these points is established by the respondents.

The foregoing conclusions were those arrived at by the district court. Dyer v. National Steam Nav. Co. [Case No. 4,224]. But there is one question which has been presented to this court, that was not discussed or considered in the court below. The answer of the respondents alleges as follows: "Respondents, further answering, say, that said steamer Scotland was by said collision sunk and destroyed, and that there is no liability in personam against these respondents for said loss of the Kate Dyer." Under this allegation the respondents insist, that their liability, as owners of the steamer, did not extend beyond the value of their interest in the steamer and in her freight pending at the time of the collision: that, as the steamer was lost by the collision, and no freight money or passage money was earned by her, the respondents are thereby discharged from liability; and that the district court had no right to exercise jurisdiction by issuing a writ of foreign attachment against the respondents, and no right to seize any property belonging to the respondents, under such writ. The answer does not state whether the alleged non-existence of liability is claimed under the act of congress of March 3, 1851 (9 Stat. 635), or under the general maritime law.

The question may first be considered on the view that the act of 1851 applies to this case. Under the third section of that act, the liability of the respondents, as owners of the steamer, for the damages sustained by the libellants by this collision, cannot exceed the amount or value of the interest of the respondents in the steamer and h·" freight pending at the time of the collision. Section 4 of that act provided that the respondents might take the appropriate proceedings in any court, for the purpose of apportion-

ing the sum for which, as owners of the steamer, they might be liable, amongst the parties entitled thereto. The claims sued for and represented by the libellants in this case are the claims for the loss of the ship and of her freight and cargo, and of the personal effects of her master and crew, and of property owned by a passenger on the ship. They comprise all the claims which could exist for any loss or damage growing out of such collision, so far as appears. This being so, and those claims being all before the district court in this suit, it was easy for the respondents to institute appropriate proceedings in that court to have the limitation of their liability adjudged, and to have the sum for which they were liable apportioned among the parties making such claims. No such proceedings were instituted, although the rules of proceeding were made by the supreme court in May, 1872, and some of the testimony as to damages was put in after that time, and the commissioner's report was made after that time, and the question of damages was heard by the district court after that time, and the final decree of that court was not made until July 17th, 1874. Moreover, the 4th section of the act provided, that it should be a sufficient compliance with its requirements, on the part of the respondents, if they should transfer their interest in the vessel and freight, for the benefit of the persons making claims, to a trustee to be appointed by any court of competent jurisdiction, to act as such trustee, for the persons who might prove to be legally entitled thereto, and that, from and after such transfer, all claims and proceedings against the respondents should cease. The district court was a court of competent jurisdiction to appoint a trustee in this case, but no such proceeding was had.

But, it is insisted by the respondents, that there was nothing in the shape of vessel or freight, or interest therein, or value of interest therein, which existed after the libel herein was filed, on the 17th of December, 1866, to which the act of 1851 could apply. In Norwich Co. v. Wright, 13 Wall. [80 U. S.] 104, it was held by the supreme court, that, by the maritime law, the liability of the owner of the vessel doing damage by collision was limited to his interest in the vessel and freight, and he was discharged by giving up that interest or by the loss of the vessel on the voyage; that, by the English law, as constituted by statute, such liability was limited to the amount and value of the vessel and freight at the time of the injury; and that the act of 1851 intended, so far as collisions are concerned, to adopt the rule of the maritime law. Therefore, under the act of 1851, it is sufficient to surrender the vessel and any freight that may have accrued, without paying into court anything further, and it is not necessary to pay or give security for the value of the vessel at the time of the collision, and of the freight

for the voyage. But, to enjoy the benefits of the act of 1851, so long as there is anything left of the vessel to be surrendered or transferred, or in or of which to have an interest capable of being surrendered or transferred, what is so left, or the interest in it, or the value of it or of such interest, must be surrendered or transferred. In the present case, it is shown that there was a large amount of anchors, chains, rigging and cabin furniture saved from the steamer and delivered to the agent of the respondents, and that what was so saved was of the value of several thousand dollars. That was a part of the vessel, and should have been surrendered or transferred, if the act of 1851 was to be availed of. Nor is there yet time for the respondents to institute proceedings under the act of 1851. No sufficient excuse is shown, as in Norwich Co. v. Wright [supra], for not having taken such proceedings. There was more than two years time after the rules of practice were prescribed in May, 1872, and before the final decree of the district court was made, during which the proceedings might have been taken in that court. The respondents, especially in view of the allegation in their answer as to their non-liability because of the alleged destruction of the steamer, must, after allowing a final decree to go against them in the district court, without instituting any proceedings under the act of 1851, be held to have waived all right to institute such proceedings now. I have not found it necessary to determine the question, whether the act of 1851 applies to the owners of a foreign vessel who seek the benefit of that act.

Undoubtedly, under the general maritime law, the liability of the owner of the vessel doing damage by collision, for the wrongful act or negligence of the master or crew of the vessel, if such owner was personally free from blame, was limited to his interest in the vessel and its freight, and ceased by his abandoning and surrendering those to the parties sustaining loss. But, he could not discharge himself without abandoning vessel and freight; nor, if vessel and freight were lost, could he discharge himself without surrendering all claims in respect of vessel and freight, such as insurance, &c. If, in consequence of the loss of the vessel on the voyage, no interest in vessel or freight remained, the ship owner was discharged, but, if any interest in vessel or freight remained, he could not be discharged without surrendering such interest. Therefore, if non-liability be claimed in this case under the general maritime law, the respondents have not put themselves in a position to claim it, because they have not surrendered or offered to surrender what remained of the vessel. On the contrary, the respondents retained what was saved from the steamer, and permitted the decree below to pass against them without surrendering it. If the answer be considered as averring that the steamer was in

such wise and to such extent sunk and destroyed by the collision, that, under the rule of the maritime law, the respondents were discharged from liability, then the answer is not supported by the evidence, for there was something left of the vessel, and what was left was capable of being surrendered.

As the personal liability of the respondents was not discharged, a cause of action in the admiralty existed against them, and the jurisdiction of this court to administer the relief asked by the libel was properly enforced by the process of attachment issued.

The owners of the ship have appealed because the decree below awards them less than the value of the ship, and because it awards them interest at the rate of 6 per cent., instead of 7 per cent., upon the amount of their damage for the loss of the ship and for her freight, and for the personal effects of the master and crew of the ship. I examined the question of the rate of interest in the case of The Aleppo [Case No. 158], and, for the reasons there stated, and in the cases there cited, the rate of interest allowed was correct. The point that the value of the ship was fixed too low, is not insisted on, on such appeal. The proper rate of interest on the value of the cargo is 6 per cent., and the appeal of the republic of Peru, on that point, is not sustained.

The final decree of the district court, besides awarding specified sums for the loss of the ship and of the freight on the cargo, and of the personal effects of the officers and crew of the ship, and of the property of the passenger, awarded to the republic of Peru, as owners of the cargo of guano which the ship was carrying, and which was totally lost by the collision, the sum of $64.731.27, in gold coin of the United States, with interest thereon, in like gold coin, at 6 per cent. This amount was arrived at, in the district court—Dyer v. National Steamboat Co. [Case No. 4,226]—by taking the market price of the guano at the port of New York, and deducting therefrom the costs and charges which would have been incurred from the time of the loss, until it could have been placed in New York ready for sale. It is contended by the respondents, that this rule of damages was erroneous, and that the proper rule in this case is the cost of the cargo at the place of shipment, with the expenses and charges actually incurred, and interest thereon. I had occasion, in the case of The Aleppo, before cited, to examine this general subject, and to consider the decisions in regard to it. In that case, a cargo of wool was lost by a collision on the high seas, a few miles from the harbor of Boston, and it is urged, that the proper measure of damages was the market value of the wool in Boston, on the day of its loss, less duties, freight, charges for landing and cost of insurance from the place of loss to Boston; and that the result arrived at by such method

of computation would be the value of the cargo at the time and place of its destruction. But, the result of the principles laid down in the cases cited and considered, was held to be, that the proper rule of damages was the value of the cargo at the port of shipment, including the expense of lading it on board and transporting it to the place of collision, with interest at 6 per cent. from the time of collision; that all beyond that was expected earnings or profits; and that the loss of them was not a proper measure of damages. The cases in the federal courts to which I refer, are those of Murray v. The Charming Betsey, 2 Cranch [6 U. S.] 64; The Lively [Case No. 8,403]; The Anna Maria, 2 Wheat. [15 U. S.] 327; The Amiable Nancy, 3 Wheat. [16 U. S.] 546; Smith v. Condry, 1 How. [42 U. S.] 28; Williamson v. Barrett, 13 How. [54 U. S.] 101; The Ocean Queen [Case No. 10,410]; and The Vaughan and The Telegraph [Id. 9,217], 14 Wall. [81 U. S.] 258, 267.

It is urged, that the owner of the cargo must be indemnified to the extent of the loss sustained; that complete indemnity for such loss cannot be given, in this case, by taking as the rule the market value of the guano at the place of shipment; that there never was a market price, as the evidence shows, for the guano, at the Chincha islands, where it was shipped, it having there neither market value nor ascertainable cost; that, nevertheless, it was an article of value, and could, at the time and place of its loss, have been easily exchanged for gold at a large price; and that, on any other rule, the recovery for the cargo would be only $1,424.25, being the cost of preparing it for shipment and the charges incident to shipment. Indemnity for loss, in the sense of the law of damages, is indemnity to a party for his having lost what he once had. In common speech, a party may lose a market, or may lose an expected profit. But that is not correct language to use in considering the law of damages. The value of this cargo of guano, at the time and place of loss, did not embrace any part of the profits which would have been realized on the cargo if it had safely reached New York. It is impossible to take the market price at New York as the standard, without taking in the probable or prospective profits. To say that this cargo could have been sold to arrive, or could have been easily exchanged for gold, at a large price, at the time and place of its loss, does not meet the difficulty. Selling the cargo to arrive, is only selling it to be paid for if and when it arrives, and leaves it subject to the contingencies of the voyage; and, if it never arrives, the price, which is a New York price, and includes profits, is not paid. The transaction of delivering the cargo at the time and place of loss, on a sale then and there just before the loss, and receiving pay for it on the spot, based on a New York price for it, as if it were at New York, and deducting only the

expense of carrying it to, and landing it at, New York, is not a real or probable transaction. It would be a transaction in which the seller would receive all the profit, and take none of the risk, of the voyage, and one which might as well be supposed to take place at the Chincha islands, in respect to the cargo on board of the vessel, as at any point of the voyage short of the port of destination. The fact that the cargo was lost within but a short distance of New York, compared with the length of the entire voyage, makes no difference in principle, because, the fact of its loss at the place where it was lost, by collision, shows that there was greater danger of its loss by collision at that place than at any previous point in the voyage. If the Scotland had not run into the ship, she might have been run into by some other ship, nearer to New York, or the cargo might have been lost in some other way, nearer to New York. If the collision had occurred one mile farther from New York, and the cargo had thereby been lost, the rule contended for by its owners might have been urged with equal weight; and so, in respect to any collision farther and farther from New York, embracing even a collision close to the port of shipment. The contingency of a safe arrival of the cargo at New York, so as to enable its owners to realize their probable or prospective profits, was, during the whole voyage, a matter of conjecture, and the result shows that there was not any less peril so near to New York than during the prior part of the voyage. To allow such profits in this case would make it necessary to allow them if the cargo had been lost by a collision close to the Chincha islands, and would establish a rule which the supreme court rejected, in Smith v. Condry [supra].

In opposition to this view, two cases are relied on. In Bourne v. Ashley [Case No. 1,699], the question was as to the value of a whale converted in the Okhotsk sea. The court held, that market price was the rule, in the case of articles which had a market price; that the wrong-doer could not escape paying damages by showing the absence of a market for the article; that there was no market price for whales any where, and no market for oil and bone in the Okhotsk sea; that, nevertheless, the fair value of the whale must be paid for; that that could not be arrived at by conjectural testimony of experts as to what they would be willing to give for whales in the Okhotsk sea; that the court was obliged to discover, as well as it might, the value of the whale to a person who happened to want it at the time and place in question; that that value must be the price of the oil and bone in some market, less the expense of making the oil and bone out of the whale and getting it to market; and that, as the market of New Bedford was the controlling market of the country, as well as the home port of both vessels, the proper standard was the value at New Bedford of the oil and bone made, or which might have been made, from the whale, less the average necessary expenses of converting the whale into oil and bone, and freight, insurance and other usual charges, with interest on the sum thus arrived at. In Swift v. Brownell [Id. 13,695], the question was as to the value of a cargo of oil and bone lost in the Arctic ocean, by a collision between two whaling vessels. The court adopted the rule laid down in Bourne v. Ashley [supra], and took the price of the oil and bone at New Bedford at the time when it would probably have arrived there, and not the New Bedford price at the time of the collision. Both of those cases proceed upon the principle, that, if there is an ascertainable market value for the cargo at the time and place of the loss, that ascertainable market value is to govern; and that, if there is no such ascertainable market value, and yet the cargo is of value to its owner, the wrong-doer cannot escape by showing that there is no such ascertainable market value. But, to show that there is no such ascertainable market value, it is not sufficient to show that the place of loss was on the high seas, where traffic does not take place, and buyer and seller do not meet in market. That is the case in every case of loss by collision on the high seas; yet, in such cases, if the cargo came from a port of shipment where traffic in it did or could take place, the value there, and not the value at the port of destination, is the rule laid down. The cases of the whale and the cargo of oil and bone, were exceptional cases. The articles in question in those cases were not shipped at any port of shipment where traffic in them did or could take place, and no value at the time and place of loss, predicated upon any value at any port of shipment, could be affixed to them. Whales and their products commence their existence as property on the high seas, and their value, if to be dealt with as a value of the property in some market, could, in those cases, be dealt with only as a value in the port of New Bedford. The property had never been in a port, or at a place, where any definite or ascertainable value had been, or could be, given to it, as a market value. Not so with this cargo of guano.

This guano, with all the guano at the Chincha islands, was the property of the Peruvian government, which exported it to foreign countries on its own account, and prohibited its exportation by any other parties. It was not bought and sold in Peru as a general article of commerce. Any citizen of Peru was at liberty to take it from the Chincha islands for use in Peru, without paying anything for it, but he could not export it from Peru. Guano, so taken, was sold in Peru, subject to such restriction as to its use in Peru, at $12 a ton, gold. But such guano did not form more than one-twentieth part of the guano taken from the islands. The guano in the Kate Dyer belonged to the Peru-

vian government, and cost it nothing but the labor of digging it out and loading it on the ship, and was being exported by it to be sold on its own account and for its own profit. One sale by the Peruvian government, of 25,000 tons of guano, for $30 gold, per ton, net, in 1864, to be exported, is shown. The price of guano at New York, at the time the Kate Dyer would probably have arrived there, was, probably, $60 a ton, gold. The owners of this guano ought to receive, as compensation, a fair indemnity for its actual loss of guano, but not for its failure to realize probable profits. The value of this guano at the time and place of loss, based on its value in Peru, can, I think, be ascertained from the evidence, in such manner as to give to its owner such fair indemnity, and yet not limit it to the recovery of only $1,424.25, as the expense of shipment, with no value in the guano itself. This can be done without conflicting with the general rule. Because the Peruvian government paid nothing for the guano, it does not follow that no value, as substantially a market value of it in Peru, can be ascertained. Nor, on the other hand, does the $12 a ton, gold, or the $30 a ton, gold, on the exceptional sales referred to, furnish a fair standard of market value.

Mr. Hobson, a merchant, residing in the city of New York, who has been for 30 years in the business of importing goods from the west coast of South America, and other South American ports, testifies as follows: "Q. Suppose an article of merchandise is produced or obtained in Peru, the same not being there sold as an article of commerce for exportation, and for which there is a market in the United States, what would you, as a merchant, consider its value in Peru, in reference to the net proceeds of its sale in the United States, if it could be bought in Peru for exportation? A. With reference to net proceeds, and looking to a fair average profit, I should think it would be worth from 10 to 12 per cent. off from the net proceeds. To get at the net proceeds, I would take out shipping expenses, freight, duties, (if any,) marine insurance, and all port charges here; also, commission for selling. If it could be bought at such rates in Peru, for exportation, that would create a demand for it there, for exportation." By this "fair average profit" the witness states that he means the usual mercantile result, after paying for the article in a foreign country, and all charges on it. There is no testimony in contradiction of this, or naming any other percentage as a deduction for a "fair average profit." The government of Peru, in respect to its guano, was a merchant, exporting it and selling it in the market of New York, and making a mercantile profit on it. To be sure, the government made a larger profit on it than the mere mercantile profit, and which larger profit included the mercantile profit; but the value in Peru which is to be ascertained, is the value of the guano as an article to be dealt with

there by a merchant seeking to export it and realize only a fair mercantile profit on it. That value is the proper value in this case, and can be readily ascertained in the method testified to by Mr. Hobson. The rate of profit is a matter of expert knowledge, as to which Mr. Hobson, as an expert, can speak. No expert contradicts him, or gives any other rate than that which he gives. Under the customs laws, where actual market value in the foreign port is required to be stated in invoices, it has been held, that, in the absence of sales, or offers to sell, in the foreign port, the cost of manufactured goods, with a manufacturer's profit added, may be resorted to as a means of ascertaining the market value of such goods in the foreign port. Six Cases of Silk Ribbons [Case No. 12,914]. In every case where market value abroad is sought to be ascertained, and there is no standard by sales abroad, that method of ascertaining such market value, or its equivalent, must be resorted to, which, under all the circumstances of the particular case, furnishes the nearest approach to such value abroad, as that a fair mercantile profit, and no more and no less, will be allowed to the merchant, in view of the net proceeds at the place of importation. That was the view in the case of the silk ribbons, and that is the view in this case. The decree in respect to the guano will be drawn up on the basis indicated.

On the appeal by the owners of the ship, the respondents must have costs of appeal. On the appeal by the respondents, the appellees, other than the republic of Peru, must have costs of appeal; and, on such appeal, as between the appellants and the republic of Peru, the appellants must have costs of appeal. On the appeal by the republic of Peru, the respondents must have costs of appeal. The decree below is affirmed as to damages, except as to the amount awarded to the republic of Peru, and it is affirmed as to the costs it awards, except as it awards costs to the republic of Peru.