## GUIBERT & SONS v. THE BRITISH SHIP GEORGE BELL.

*(District Court, D. Maryland.   July 6, 1880.)*

1. COLLISION—DAMAGES—FRENCH FISHING BRIG.—The measure of damages for the loss, by collision, of a French fishing brig, is her regular building and market price in France, with interest from the date of the collision.

2. SAME—SAME—COST OF OUTFIT.—One-fourth of the cost of the outfit of those things required for the business of fishing and the provisioning of the crew, which are consumed every season, will be allowed in damages where such brig had been engaged three-fourths of the season for which she was equipped at the time of the collision.

3. SAME—SAME—CUSTOM CHARGES.—In such case custom-house charges, etc., may properly be treated as part of the cost of sending out the vessel for the whole season's fishing, and one-fourth of them can therefore be properly allowed in damages under the head of "outfits."

4. SAME—SAME—CARGO.—It is now well established that the value of a cargo lost by collision is to be ascertained by taking the cost of the cargo at the place of shipment, and adding the cost of loading it on board, and the cost of navigating the vessel to the place of collision.

5. SAME—SAME—SAME.—In such case the market price at the port of destination is not allowed to enter into the estimate of the value, and all profits or probable benefits which would have resulted from the termination of a voyage almost completed, are rigorously excluded.
    *The Amiable Nancy*, 3 Wheat. 456.
    *The Lively*, 1 Gall. 314.
    *Smith* v. *Condry*, 1 How. 28.
    *The Vaughn and The Telegraph*, 14 Wall. 258, 267.
    *The Aleppo*, 7 Ben. 120, 124.

6. SAME—SAME—SAME.—Where the cargo consisted of fish taken from the sea at the place of collision, and it was therefore impracticable to apply literally the rule allowing only the prime cost of the cargo at the place of shipment; and where it further appeared that the ship was a French vessel, and that the collision took place near a French port, and that such port was a market for such fish, and could have been reached without appreciable expense,—the court fixed the value of the cargo at the market price of such fish in the said adjacent port.

7. SAME—SAME—PROBABLE EARNINGS.—Probable earnings will not be allowed in a case of total loss by collision, but interest from the date of destruction is given in lieu of the profit which might have been gained by the owner by the subsequent use of his vessel.

In Admiralty.

*Brown & Brune,* for libellants.

*Brown & Smith,* for respondents.

MORRIS, D. J.   This libel was originally filed by the owners of the French brig Briha, a fishing vessel of 150 tons, against the British ship George Bell, *1,100 tons*, for a collision which took place on the ninth of August, 1878, off the Grand Banks of Newfoundland, in consequence of which the fishing vessel was sunk, with the loss of two of her crew, and all the property on board.   When the case came on for hearing, the court (*Hughes*, J.) held that the ship George Bell was solely to blame, and the case was referred to a master to compute the damages.   Exceptions are now taken to the master's report, and it is these exceptions which are now to be passed upon.

The first exception is to the sum allowed by the master as the value of the Briha at the date of the collision.   The testimony shows that she was built in the port of St. Servan, in France, in 1876, for the libellants; and that she was especially built for the purpose for which she was being used; and that she cost, without paying any builders' profit, and without outfits, 43,600 francs; and that to have purchased her from a builder she would have cost 50,000 francs.

The proof shows that a proper allowance for deterioration from use is 10 per cent. for the first, and 5 per cent. for the second year.   The testimony taken in France with regard to her cost, her superior solidity, and her excellent condition when she left France on her last fishing voyage, and as to the cost of similar vessels at the time of her loss, is satisfactory and convincing, and I am satisfied that she was worth to the owner all the master has allowed, viz., 40,000 francs, and that she could not have been replaced for less money.

Much testimony was taken to show that vessels of the same tonnage, which English and American fishermen consider superior to her for the business of fishing off the Grand Banks of Newfoundland, could be built or purchased for a considerably less sum in the United States or Great Britain or Canada; but what the libellants are entitled to have restored to them is a French fishing brig of the kind French fishermen are willing to use for the business, and as such vessels are constantly built in France for the purpose, and there

is a regular building and market price for them in France, it is that price which is the damage the owners have sustained in losing the Briha. The report of the master is therefore sustained as to the value of the Briha, with the allowance of interest from the date of collision.

The next item of the report, which is excepted to, is the allowance by the master of one-fourth of the cost of the outfit for the Briha of those things required for the business of fishing and the provisioning of her crew which are consumed every season. The Briha, to the date of the collision, had been engaged three-fourths of the season for which she was equiped, and therefore, as nearly as can be estimated, had consumed three-fourths of her supply, leaving on board one-fourth, which was lost by the collision. I can find no error in the method by which the master has arrived at the amount allowed by him, nor any defect in the proof in support of the items, except with regard to the salt. He has made a separate allowance of 825 francs for the estimated amount of salt remaining on board, but I am inclined to think that the cost of all the salt is included in account Exhibit D, which was filed by Maturin Auguste Guibert as a complete statement of the cost of the entire outfit of the vessel. I think this account includes the cost of all the salt. Guibert rested upon that account as a full statement of all his expenditures for outfits, and it was only when, under cross-examination with regard to it, that, in support of the testimony given in chief, he details the exact amount and cost of the salt. This was a very considerable item of the outfits, and one which he would not probably have omitted in making up his account. The item of 825 francs is, therefore, not allowed. The other small items in this account, for custom-house charges, etc., which are objected to, I think the master has properly treated as part of the cost of sending out the vessel for the whole season's fishing, and one-fourth of them is properly allowed under the head of "outfits."

The third item of the report, which is excepted to, is the price fixed by the master as the value of the cargo of fish, or, as it is called, the "catch," which were on board, and were

lost by the sinking of the Briha.    The master finds from the evidence that there were on board of the Briha, at the time of collision, 32,000 cod-fish, salted down in the hold of the vessel, averaging 45 quintals to the thousand, making 1,440 quintals of fish; the quintal being the French quintal of 55 kilograms, equal to about 114 pounds.

The value of these fish the master finds to be 25 francs, (say five dollars per quintal.)

The testimony shows that in September, 1878, the price of cod-fish at Bordeaux, in France, green from the fishing vessels, coming from the Grand Banks, was 28 francs per quintal, (about $5.50.)    The testimony further shows that it is not unusual for the French fishing vessels to sell their first catch of the season at the French island of St. Pierre, off Newfoundland, near where the Briha was fishing when sunk, and that during the season of 1878 some of the French fishing vessels sold their first catch there at 16 francs per quintal, (about three dollars,) and that St. Pierre is a market for cod caught by French vessels, and that they are shipped thence to France.

The testimony of numerous witnesses of great experience in the principal fishing ports of New England and Canada, nearest to Newfoundland, proved that in those markets, in which cod-fish is an important article of commerce, $1.75 per 100 pounds was the full value of such fish as were on board the Briha at the time of the collision.

The general rule is now well established that the value of a cargo lost by collision is to be ascertained by taking the cost of the cargo at the place of shipment, and adding the cost of loading it on board, and the cost of navigating the vessel to the place of collision.    This is held to be the value of the cargo at the time and place of loss.

No matter how near the vessel may have reached to her port of destination, the market price at the port of destination is not allowed to enter into the estimate of the value, and all profits or probable benefits which would have resulted from the termination of a voyage almost completed, are rigorously excluded.    *The Amiable Nancy,* 3 Wheat. 546; *The*

*Lively*, 1 Gull. 314, (315;) *Smith* v. *Coudry*, 1 How. 28; *The Vaughan and The Telegraph*, 14 Wall. 258, 267; *The Aleppo*, 7 Ben. 120, 124.

The difficulty in the present case arises from the fact that the fish, which constituted the cargo of the Briha, had been taken from the sea at the place of collision, and had no prime cost, and there was no market for them at the place of collision; yet they had a very considerable value, and represented a large expenditure of capital, time, labor, and risk of life and property.

This difficulty of applying the general rule confining the damage to prime cost at the place of shipment, and excluding all conjectural profits, has been met with in other cases which have come before our admiralty courts.

In several cases in admiralty, arising out of the tortious conversion of captured whales in the Arctic seas, there being no market near those regions for whales, or their products, the court has been obliged, in order to do justice, to ascertain the value in some market; and as New Bedford, although at a great distance, was the controlling market of the country, and was also the home port of the vessel, the market price at New Bedford at the time when the vessel suffering the loss could reasonably have reached there, less the expense of carrying the product there, was of necessity adopted by the court as the measure of damage. *Bourne* v. *Ashley*, 1 Low. 27; *Bartlett* v. *Budd*, Id. 223; *Faber* v. *Jenny*, 1 Sprague, 315.

The same rule was also of necessity adopted in the case of a collision between two whaling vessels in the Arctic seas. *Swift* v. *Brownell*, 1 Holmes, 467. The case of *Dyer* v. *The Nat. Steam Nav. Co.* 14 Blatchf. 483, was a case in which a vessel loaded with guano, belonging to the republic of Peru, was lost by collision, having nearly reached New York, her port of destination. It was shown that all the guano in the Chincha islands was the property of the Peruvian government, which prohibited its exportation by any other than itself. So that, as it was never bought or sold at the place of shipment as an article of commerce, and cost the government nothing but the labor of digging and loading it on the

ship, its prime cost at the place of shipment would be an insignificant sum, notwithstanding the fact that if the ship had preceeded safely a short distance further on her voyage, and had reached the port of New York, the cargo would have been worth $60 a ton.

With these facts before it the court (*Blatchford*, J.) was obliged to discover some reasonable method of applying the rule, which, while it would exclude profits, would not deny substantial restitution to the party injured.

This the court did by deducting from the price in New York the expenses of the voyage, and an amount which the proof of experts showed would be considered by an importer a fair average profit for importing such an article.

The learned judge was compelled, in the absence of other data, to arrive at the price of the guano at the place of shipment by taking the market price at the place where it had a market price, and after deducting the expenses, and an average profit to an importer of similar articles, he treated the residue as the equivalent of the market price at the place of shipment. That is to say, the price which merchants would probably be willing to give for the guano for exportation at the place of shipment if it was possible to buy it.

These cases serve to show that it has been found impracticable to apply literally, in all cases, the rule allowing only the prime cost of the cargo at the place of shipment. In the case before me now it appears that the port of St. Pierre is a French port, near to the place of collision; that it is a market for cod, and a port where French fishing vessels quite commonly sell a portion of their "catch."

It also would appear from the testimony that there is some advantage of price there for fish caught by French vessels, and that American cod-fish are not salable in France. It would not, therefore, I think, be just to undertake to estimate the value of the "catch" of the Briha by the price of similar fish in the fishing ports of New England or Canada, but I can see no objection to taking the price at St. Pierre as a basis. It was the nearest French port, and one not distant from her anchorage at the time of the collision. It is a mar-

ket for fish caught by French vessels for shipment to France; and I think the price obtained there must represent, as near as it can be in any way gotten at, the average cost to all parties concerned of catching and landing the fish there.

The great difference between the price at St. Pierre (16 francs per quintal) and the price at Bordeaux (28 francs) has not been explained, and I think it must represent not only profit, but most probably considerable port charges or duties in France. Certainly, as the price in America for similar fish was not over 10 francs per quintal, 28 francs cannot be the actual value of the fish outside of France, with merely freight to Bordeaux added.

It has been urged with force that, as in cases of collisions, where there is freight actually contracted for, the freight then pending, less the expenses of completing the voyage, is allowed as part of the damages; and that in such cases as this, the fish themselves costing nothing, the price they would have produced in Bordeaux (which was the Briha's port of destination) should be regarded not as profit, but as the freight earned by the vessel and wages earned by the crew according to the several and respective shares of the vessel and the crew in the proceeds of the "catch."

It seems to me, however, that to adopt this rule would be to let in the very dangers and uncertainties sought to be excluded by the decisions directed against allowing profits in any shape. It could be invoked in every instance in which the owner of the vessel was also the owner of the cargo, and expected to make freight for his vessel by the profit on the cargo. It would open the door to all the uncertainties of a calculation based upon fluctuating markets and a conjectural termination of the voyage. As the Briha was near to the port of St. Pierre, and could have proceeded there without appreciable expense, I think the price there, viz., 16 francs per quintal, without deduction for any expense of getting there, should be allowed as the value of the "catch" which was lost, with interest from the date of collision. With regard to the sum allowed for the cod-liver oil, which is also excepted to, I think the finding of the master is the only one

which the testimony supports, and I am also of opinion that the sums allowed by him for the clothing and personal effects of the master and crew have been sufficiently proved.

The libellants excepted to the master's report because the sum allowed for the fish was not, in their judgment, sufficient, and also because the master disallowed their claim for the probable "catch" which with reasonable certainty they would have taken if they had been permitted to fish for the remainder of the season. The master reports that the testimony shows that there remained 30 days of the fishing season, in which with reasonable certainty those on the Briha might have taken 15,000 fish, additional to the cargo then on board. I think the master properly rejected this claim. It is clearly to be excluded, under the rule hereinbefore adverted to.

The probable earnings of a vessel have sometimes been considered in cases of partial loss in collisions, when there was no other means of ascertaining the loss to the owner by the detention of his vessel while being repaired; but, in cases of total loss, interest from the date of destruction is given in lieu of the profit which might have been gained by the owner by the subsequent use of his vessel.