**BOSTON IRON & METAL CO. v. S. S. WINDING GULF et al.**

No. 2757.

United States District Court
D. Maryland, Admiralty Division.

March 22, 1949.

---

1. No opinion for publication.

Frank, Skeen & Oppenheimer, John H. Skeen and John H. Skeen, Jr., Baltimore, Md., for libellant.

Bingham, Dana & Gould and Charles S. Bolster, Boston, Mass., Niles, Barton, Morrow & Yost and Theodore R. Dankmeyer, Baltimore, Md., for Winding Gulf.

CHESNUT, District Judge.

This was an admiralty collision case in which an interlocutory decree of the court was filed September 5, 1947, after the filing on June 10, 1947 of an extended opinion of court, which is reported at D.C., 72 F.Supp.

50. The decree provided the damages should be divided. After long and unsuccessful negotiations between the parties to stipulate for the amount of damages, the question as to the amounts was recently submitted to the court for decision. As appears from the opinion heretofore filed, the libellant's vessel, an old and obsolete destroyer purchased for scrap value by the Boston Iron & Metal Company was sunk and became a total loss as a result of the collision. The other ship involved, the Winding Gulf, was damaged by the collision. The principal controversy over the amount of damages sustained by the respective ships was with regard to the valuation to be placed on the obsolete destroyer known as the "I-24". From the evidence submitted to the court I make the following finding of facts.

1. At the time of the collision the Destroyer I-24 was owned by Boston Iron and Metal Co., which corporation has since been renamed Boston Metals Co. (There being no significance to the time of change of name as to any issue here involved, the present shorter name is hereinafter used for purposes of convenience.)

2. The I-24 was first commissioned by the United States Navy in 1919 and was originally named "Bancroft". She was one of the fifty destroyers traded to the British before our entry into the war. After having been delivered to the British, she was renamed "St. Francis" and became a vessel of the Royal Canadian Navy.

3. Boston Metals Co. purchased the I-24 on July 2, 1945, from E. Frankel & Sons of Toronto for $6591 U. S. currency in her then condition at Sydney, Nova Scotia.

4. The I-24 was purchased exclusively for scrapping and could not under the terms of purchase be put to any other use.

5. As a result of the collision, the I-24 sank a short time thereafter and became a total loss.

6. The I-24 had been towed from Sydney to the point of her loss at an expense to Boston Metals Co. of $3,048.91.

7. For some time prior to July 2, 1945, and since said date, Boston Metals Co. has

been engaged in the scrap iron and steel business dealing principally with the dismantling of ships (R. p. 24).

8. The I-24, at the time of her purchase by Boston Metals Co., was one of a group of six similar overage destroyers purchased by said corporation from said E. Frankel & Sons (R. p. 26).

9. The names of said six destroyers, amounts paid therefor, dates of their purchase, of their arrival at Baltimore and of the completion of their dismantling by Boston Metals Co. are respectively as follows (R. pp. 26, 27):

| Name | Price Paid | Towing Paid | Dates Purchased | Dates Arrived | Dates Dismantling Completed |
|------|-----------|-------------|-----------------|---------------|------------------------------|
| Salisbury | $7000. | | 10/12/44 | 5/31/45 | 2/28/46 |
| Mansfield | 7000. | | 10/12/44 | 5/31/45 | 10/15/46 |
| Buxton | 6591. | | 6/ /45 | 7/11/45 | 12/31/46 |
| Annapolis | 6591. | | 6/ /45 | 7/11/45 | 6/ /46 |
| Hamilton | 6591. | | 7/2/45 | 8/23/45 | 12/31/45 |
| St. Francis | 6591. | *3048.91 | 7/2/45 | LOST | ———— |

10. The said six destroyers were purchased over a period of time from October 1944 until July 1945, as a result of negotiations carried on by Mr. Morris Shapiro of Boston Metals Co., who made a visit to Canada some time in 1944, and made arrangements with Mr. Egmont Frankel whereby Boston Metals Co. agreed to pay E. Frankel & Sons a certain commission on any of these vessels on which they were the successful bidder from the Canadian Government; and as E. Frankel & Sons acquired these vessels, they in turn sold them to Boston Metals Co. at the bid price plus their commission (R. p. 26).

11. Between June and November 1945, Boston Metals Co. bid on two offerings of submarines at the Philadelphia Navy Yard but was not the successful bidder on either occasion (R. p. 53).

12. In November 1945, Boston Metals Co. submitted bids on fifteen destroyers offered by the United States Navy then lying at Cape May, New Jersey, and it was awarded said fifteen destroyers on December 6, 1945, at a price of $8,777 each, as is, where is (R. p. 53, p. 47).

13. Of said fifteen destroyers, at least seven were of the same original class as the I-24 (R. p. 71, pp. 75-6).

14. Boston Metals Co. paid approximately $750 per destroyer to tow each of said fifteen destroyers from Cape May, New Jersey, to its anchorage at Baltimore (R. p. 47).

15. Said fifteen destroyers began to arrive at Boston Metal Co.'s anchorage at Baltimore in the very early part of 1946 (R. p. 67).

16. Boston Metals Co. stored all destroyers and other vessels purchased for scrapping at an anchorage about one-half mile from its yard at Baltimore, where such vessels remained until they were taken to its yard for scrapping (R. p. 28).

17. Boston Metals Co. has, since its purchase of the I-24, built up and maintained a stockpile of destroyers and other metal vessels at Baltimore to be scrapped.

18. When the first of the fifteen destroyers awarded to Boston Metals Co. by the United States Navy on December 6, 1945, arrived at its anchorage at Baltimore, Boston Metals Co. was still working on dismantling some of the six Canadian destroyers above mentioned (R. p. 67).

19. There are still, as of February 1, 1949, in Boston Metal Co.'s anchorage at Baltimore some of the fifteen destroyers purchased by it from the United States Navy at Cape May, N. J. (R. p. 71).

20. The Boston Metals Co. claims the value of the destroyer at the time of its

* Apportioned to place of sinking.

sinking was $46,449.32 as shown on Libellant's Ex. No. 1. In this exhibit the estimated cost of dismantling the destroyer is given at $6.45 per gross ton for direct labor on 1123 gross tons but there is no detailed evidence as to the manner in which the estimate of $6.45 per gross ton for direct labor was arrived at except that it results from an estimate. Similarly the estimate of $3621.67 to cover overhead charges allocable to dismantling was an estimated percentage figure. Said figure of $46,449.32 is without deduction for the cost of the destroyer to the Boston Metals Co. and the towage expense paid by it to point of sinking.

21. At the time of collision the destroyer had no value as a vessel, having been bought for the sole purpose of conversion to metal scrap and having been sold on the condition that she be so converted.

22. Boston Metals Co. has for many years past been engaged in the ship breaking business and converting vessels to scrap. This business is a specialty with only a comparatively small number of companies engaged in it. It is necessary to buy vessels for conversion (such as obsolete destroyers of the type of I-24) as the opportunity occurs, in order to maintain an inventory.

23. Prior to acquiring the destroyer I-24 and five other vessels, the Boston Metals Co. had embarked on a long range program of establishing an inventory of vessels to be used for scrap and the said program involved the purchase of as many such vessels as the Company could acquire when offered for sale. The purchases of obsolete naval vessels both before and after the loss of the I-24 were made in connection with its prior determined intention to acquire as large an inventory as possible. It is not ordinarily possible for any Company in the ship breaking industry to buy obsolete vessels except as they are offered for sale at the discretion of the United States Government or the Navy Department.

24. In connection with its business the Boston Metals Co. has found it necessary to and did determine the approximate amount of the various ferrous and non-ferrous metals contained in a destroyer of the class and type of the I-24. These amounts are approximately shown in the libellant's Ex. No. 1, and the I-24 was acquired by the Boston Metals Co. because of the prior determined amount of scrap contained in the vessel.

25. The prices per ton on July 13, 1945 of the scrap metal contained in the I-24 were established by Regulations of the Office of Price Administration and such scrap was actually sold by libellant and others at said prices during July 1945. The prices shown on the Exhibit are the OPA prices prevailing in July 1945 for scrap metal. The price of Thornycroft tubes and white metal as indicated on the Exhibit are determined by actual sales of such materials made during July 1945.

26. As a result of the collision the respondent and cross-libellant, Massachusetts Trustees of Eastern Gas & Fuel Associates, the owner of the steamer Winding Gulf, had extended repairs made in amounts aggregating $18,657.04, but there is an additional possible element of damages to the Winding Gulf with regard to the detention of the ship pending repairs. The ship was under charter to an agency of the United States Government and there is still an open and unsettled question between the Government and the respondent with regard to what net amount of damages may hereafter be determined to have accrued by virtue of the detention. Counsel are still negotiating with regard to this item, and have requested that there be no finding made on that particular point at the present time.

27. As an ultimate finding of fact, I find that the fair and reasonable value of the destroyer I-24 at the time of the collision and her total loss was $15,000.

### Discussion

[1] There is a very wide difference between the parties to this case with respect to the damage sustained by the libellant in the loss of the destroyer. Her owner contends that her value and consequent damages amounted to $46,449.32. Contrasted with this the owners of the Winding Gulf contend that the fair value of the destroyer was only $9,639.91, consisting of her cost

in Nova Scotia plus expense of transporting her to the point of collision and loss. The determination of the value of the destroyer is difficult because it is impossible to find from the evidence any clear and definite sum that would reflect her market value at the time. Indeed the destroyer had no market value. While classed as a ship in the admiralty law, it is clear that she had no market value or indeed any value intrinsically as a ship. Her only value was what would result from the scrap value of her metal parts when broken up and a sale of the scrapped material at market prices, from which should be deducted the cost and expense in that operation. In this connection counsel for her owner refers to the only adjudicated case which has been called to my attention which involved a somewhat similar problem of valuation, where the court had the problem to value a dead ship that had no market value as a vessel. The C. H. Northam, D.C.Mass.1909, 181 F. 985. In that case the court said: "It can hardly be said that the ordinary rule for ascertaining the market value of a vessel is possible of application in her case. Evidently in the ordinary market for vessels she had no value, for the reasons stated by the master, and, instead of directing the inquiry to the market value, it was necessary to resort to other methods of appraisal. The master has taken the total value of the material contained in her, has deducted the total expense of breaking her up and getting the material out, and has allowed the balance of $413.79, then remaining, as her value for the purposes of this case. I am unable to see why this method of arriving at her value is not proper and just under the circumstances."

This case is persuasive in principle but it cannot be applied here to the extent and in accordance with the particular figures contained in the libellant's exhibit No. 1 which itemizes the estimated quantities of scrap metal which would have been realized from breaking up the ship and a sale thereof at OPA prices prevailing in July 1945, which produces a total of $57,314.34 from which is deducted the estimated cost of dismantling and of overhead expense in all

aggregating $10,865.02, and produces a net balance of $46,449.32. Assuming the correctness of the stated market prices applied to the estimated quantities, it still appears that the cost of dismantling and the overhead cost thereof to the defendant is hardly more than an estimate, and in addition it seems clear enough that the net figure obtained must necessarily have included the owner's profit in the operation. I am not sure but that there would have been other expenses possibly in the nature of general selling expenses, which would have to be deducted from the proceeds of the sale of the scrap at market prices. I think, therefore, the evidentiary value of the exhibit must be given only the limited weight of indicating that the value of the destroyer at the time of the loss was substantially greater than her cost of purchase and expense of transportation, the latter apportioned to the place of loss. And in this same connection there was some evidence to the effect that the general experience of the business was that a destroyer of this type when bought for scrapping generally produced about $18,000 more than her cost. It seems to be well settled on the authorities that in the case of a total loss of a vessel as such the rule is well established that the measure of the owner's loss is the market value of the vessel at the time and place of the loss if this can be determined. The Umbria, 166 U.S. 404, 421, 17 S.Ct. 610, 41 L.Ed. 1053; Standard Oil Co. v. Southern Pacific Co., 268 U.S. 146, 155, 45 S.Ct. 465, 69 L.Ed. 890.

■ It is apparently agreed by counsel for both parties in this case that the real value of the destroyer at the time of loss was only such value that she had for scrapping. And in this connection the proctor for the Winding Gulf invokes the rule of damages applicable to loss of cargo which is generally held to be the market (invoice) value at the port of shipment plus the cost of insurance, freight, loading and other similar expenses necessarily incurred in moving the goods from point of shipment to the collision, but without allowance for anticipated profits. The Scotland, 105 U.S. 24, 35, 26 L.Ed. 1001; Smith v. Condry, 1 How. 28, 42 U.S. 28, 34, 11 L.Ed. 35; Standard Mar-

ine Ins. Co. v. Scottish ·Metropolitan Assur. Co., 283 U.S. 284, 288, 51 S.Ct. 371, 75 L.Ed. 1037; Guibert & Sons v. The British Ship George Bell, D.C.Md., 3 F. 581, 584.

Accordingly counsel for the Winding Gulf argues that the value of the destroyer was limited to her cost in Sydney, Nova Scotia, plus the apportioned towage expense to the point of collision, to wit, $9,-639.91. But I am not satisfied that this limited basis for valuation is the correct one to apply in this case. The rule which I think should be applied in this case is well stated by Mr. Justice Butler for the Supreme Court in Standard Oil Co. v. Southern Pacific Co. supra, 268 U.S. 155, 156, 45 S.Ct. 465, 467, 69 L.Ed. 890: "It is fundamental in the law of damages that the injured party is entitled to compensation for the loss sustained. Where property is destroyed by wrongful act, the owner is entitled to its money equivalent, and thereby to be put in as good position pecuniarily as if his property had not been destroyed. In case of total loss of a vessel, the measure of damages is its market value, if it has a market value, at the time of destruction. The Baltimore, 8 Wall. 377, 385, 19 L.Ed. 463. Where there is no market value, such as is established by contemporaneous sales of like property in the way of ordinary business, as in the case of merchandise bought and sold in the market, other evidence is resorted to. The value of the vessel lost properly may be taken to be the sum which, considering all the circumstances, probably could have been obtained for her on the date of the collision; that is, the sum that in all probability would result from fair negotiations between an owner willing to sell and a purchaser desiring to buy."

While the above stated rule was applied by the court in the case of a ship, which apparently had no market value as such, the rule is not materially different, so far as we are here concerned, from the rule that is customarily applied in federal land condemnation cases where the jury, at least in this district, is currently told in part, at least in cases where no definite market value is obtainable, that they should allow such value as they find on the best evidence in the case to be the sum which a willing buyer would pay to a willing seller. See also recent land valuation cases in this Fourth Circuit, United States v. 25.406 Acres of Land, etc., in Arlington County, Virginia, 1949, 172 F.2d 990; United States v. Powelson, 4 Cir., 138 F.2d 343.

In this case the destroyer had no value as a ship, and I think it would be unfair and unreasonable in determining her value as scrap to limit the valuation, as counsel for the Winding Gulf contends, to the mere basis of the cost and expense incurred by the owner, and thus treat this peculiar kind of property merely as cargo to be valued at invoice value of cost plus expenses. Indeed, as pointed out by Judge Parker in United States v. 25.406 Acres of Land, etc., in Arlington County, Virginia, supra, market value in such a case is a mere hypothetical concept. While the valuation as exactly finally determined must be more or less arbitrary, as indeed jury verdicts necessarily generally are in land condemnation cases, it seems fairly clear to me that the fair value of the destroyer was more than the mere cost to the owner up to the time and place of the loss. Nor is the cost of replacement an important factor in this case by reason of the peculiar nature of the owner's business, the purposes for which the destroyer was bought. The particular business is a specialty and its success depends very largely on the "know how" of the proprietor with respect to both the opportunity to purchase at all and the price to be paid. This "know how" comes only from previous extended business experience, organization and practical affairs. The peculiar kind of property which is dealt with is not something that is commonly available in the way of ordinary business as in the case of merchandise bought and sold in the market. It is therefore necessary to resort to other criteria and factors to determine fair value in this case. Neither the cost of construction nor reconstruction is of any particular value in this case. No doubt the destroyer when originally built cost the United States more than $1,000,000; but by nature it apparently was of comparatively little value in 1945 to the then owner from whom the Boston

Metals Company bought it. The best that can be done by the valuer is, as Mr. Justice Butler said in the Standard Oil case, supra, to determine as the value "the sum that in all probability would result from fair negotiations between an owner willing to sell and a purchaser desiring to buy." And as he later said in the same connection, 268 U. S. at page 156, 45 S.Ct. at page 467, 69 L. Ed. 890: "It is to be borne in mind that value is the thing to be found, and that neither cost of reproduction new, nor that less depreciation, is the measure or sole guide. The ascertainment of value is not controlled by artificial rules. It is not a matter of formulas, but there must be a reasonable judgment having its basis in a proper consideration of all relevant facts."

In applying this rule it seems clear to me that to the owner this destroyer at the time of loss had a value substantially greater than its cost to the libellant. As a practical test I think the evidence fairly leads to the view that considering all the relevant facts some person engaged in a similar business would fairly have been willing to pay for the destroyer as an entity at the time and place of loss substantially more than what it had cost the owner up to that time. It must be remembered that the purchase was made by one skilled in the particular business taking advantage of a particular opportunity not often afforded, and resulting from skill and knowledge of when, why and how to buy. Or, in other words, it may be said that the evidence as a whole fairly indicates that in the purchase the owner made a very good bargain and is entitled under the circumstances of the loss to have the damages fixed at a sum which would fairly pecuniarly reimburse him for the loss incurred.

■ Respondent and cross-libellant contends that an award to the libellant of more than the cost of the destroyer (to the libellant) and of the towage would be tantamount to an award of profits and that profits are not a proper element of damages. This contention results from too slavish an application of the rule of damages applicable to lost merchandise and fails to recognize the important distinction between value and profits. Value reflects an object's worth as of a certain past or present date, without regard for what it would or might be worth at a future date in a changed economic situation. This latter element is the profit element (which, when applicable, is only one element in the measure of damages) and has no application when the correct and only element and measure of damages is value at the present or a past date. The fact that the value of an article is more than its initial cost does not amount to an award of profits, and the difference cannot be so denominated. This increase results from the owner's skill and perspicacity and from changes in the economic situation and is a known or ascertainable fact based on events in the past and is not an estimation or guess as to what will or might occur in the future. Mere repayment of what the owner has expended will not make him whole (the purpose of any measure of damages) when the lost item cannot be replaced for what he expended to purchase it.

■ Counsel for the Winding Gulf emphasizes the fact in the evidence that some months after the loss of the particular destroyer, the Boston Metals Company also became the successful bidder for other destroyers of approximately the same metal tonnage at a cost of less than $10,000 each. But while I have given weight to this fact in the whole problem of valuation, I do not think it constitutes of itself an absolutely limiting factor because, as pointed out, the opportunity to buy materials of this kind is sporadic and uncertain as to time and place. Furthermore, another fact in evidence is that the success of the particular scrapping business depends not only on the application of experienced judgment as to prices to be paid and other prices bid, but on comparatively limited opportunities to buy at all, and the success of the business, therefore, depends, to some extent at least, upon the quantity of purchases possible at desirable prices. The final result is, and I have concluded, that the fair value of the destroyer at the time of the loss and the consequent damages for her loss should be fixed at $15,000.