KING FISHER MARINE SERVICE,
INC., Plaintiff-Appellee,

v.

The NP SUNBONNET, Her Engines,
etc., et al., Defendants,

and

Newpark Marine Services, Inc.,
Defendant-Appellant.

No. 82–3697.

United States Court of Appeals,
Fifth Circuit.

Feb. 13, 1984.

J. Fredrick Kessenich, New Orleans, La., for defendant-appellant.

George J. Fowler, III, New Orleans, La., for plaintiff-appellee.

Before GEE, TATE and HIGGINBOT-HAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Newpark Marine Services, Inc. appeals from a judgment entered after a bench trial in favor of King Fisher Marine Service, Inc. for the value of a King Fisher barge sunk while in tow by Newpark. The district court awarded damages for the total loss of the barge plus interest. Newpark argues that King Fisher Marine failed to prove Newpark's liability, that the district court awarded excessive damages and interest, improperly modified its opinion and that King Fisher furnished an unseaworthy vessel. Finding the court's modification appropriate and its findings not clearly erroneous, we affirm.

I

For several years King Fisher, president of King Fisher Marine, had been looking for a barge suitable for use as a platform for a drydock. In early February 1979 King Fisher, accompanied by the seller's representative, Jessie Pruitt, inspected a barge which had been advertised in the Waterways Journal. Once an undersea mat for a drilling rig, the barge was basically a large steel box with four internal compartments and two attached pontoons. The barge was capable of carrying 180 tons per foot of depth and when empty had approximately two to three feet of freeboard. According to King Fisher, he inspected both pontoons through open manhole covers and found them filled with Styrofoam and evidently he was told that the internal compartments were empty but that the pontoons were

filled with Styrofoam. Pruitt's men then cut a hole in one of the internal compartments and King Fisher found only about one inch of condensation inside. Pruitt testified that all eight manhole covers to the barge had been unbolted by his crew, that King Fisher opened manholes in the center of the barge, and that he and King Fisher inspected the barge for two to three hours. Pruitt and King Fisher told McMenany's men to reweld the hole and manhole covers. When Pruitt and King Fisher left the men were preparing to do so but had not yet begun. King Fisher was satisfied that the barge had internal integrity due to the small amount of water they found, the fact that the barge was sitting level and that it had recently carried a large quantity of steel.

Newpark's representative, Wayne Martin, testified that King Fisher told him that the barge could not sink because of the Styrofoam. King Fisher denied making such a statement. Rene LeBouef, captain of Newpark's tug the Sunbonnet, and the ship's mate, Donald Theriot, inspected the barge on February 13, 1979. LeBouef noted that at least one of the barge hatches was loose and that the compartment underneath it contained Styrofoam. LeBouef also found a narrow two-foot crack on the barge. Theriot found a hole three feet in diameter covered with a plate. When he lifted the plate four to five inches Theriot could see Styrofoam underneath. Although Theriot reported this to LeBouef, LeBouef did nothing about any of the findings and failed to report them to Newpark's office.

Because of fog, the Sunbonnet did not go into the Gulf for another day and a half. During that time, LeBouef noticed no loss of freeboard, indicating to him that there were no holes in the bottom of the barge and he testified that the barge was seaworthy. Although LeBouef and Theriot were not licensed to command an offshore towing tug, on February 14th the Sunbonnet, with the barge in tow, sailed into the Gulf. At midnight Theriot took over the helm and LeBouef went to sleep. Theriot thought the tug's speed was six to seven miles per hour while LeBouef recalled that when he left the helm the tug was at a three quarter speed of four miles per hour. Theriot testified that when he took over the helm the swells were to three feet and were breaking over the barge. LeBouef testified that he thought the swells were smaller when he relinquished command but that later that morning they increased.

The barge was being towed directly astern with a 300 foot line. Theriot relied on several lights attached to the barge to keep sight of it, but was unable to see its freeboard because the tug's spotlight would not rotate a full 360°. After a while Theriot could not see the lights of the barge. Still later he turned the tug to reach the barge with the spotlight. Only then did he realize that its bow was under water and only the starboard stern was visible. Theriot then woke LeBouef who on calling Newpark's office was told to head slowly toward more shallow water. LeBouef gave this order and went back to sleep. After about an hour Theriot again awakened LeBouef and informed him that the barge was completely submerged and water was entering the stern of the tug. LeBouef ordered the line cut.

At trial LeBouef conceded that had he to do it over again he would have let out more line instead of cutting the line so quickly. The barge sank in approximately thirty feet of water. No buoy was attached to the line before it was cut. Instead, LeBouef read his location and dropped a buoy to mark the site. Newpark reported the sinking to the Coast Guard stating that the hatch covers were not secured and recommended that they be secured in the future. The barge was never located.

## II

The district court found that the barge was seaworthy and that Newpark's negligence caused the loss of the barge. The tow, King Fisher, warrants the seaworthiness of the vessel—that it is sufficiently staunch to withstand the pressures that ordinarily accompany the intended voyage. *S.C. Loveland, Inc. v. East West Towing,*

*Inc.,* 415 F.Supp. 596, 605 (S.D.Fla.1976) *aff'd.* 608 F.2d 160 (5th Cir.1979), *cert. denied* 446 U.S. 918, 100 S.Ct. 1852, 64 L.Ed.2d 272 (1980); *Derby Co. Ltd. v. A.L. Mechling Barge Lines, Inc.,* 258 F.Supp. 206, 211 (E.D.La.1966) *aff'd.* 399 F.2d 304 (5th Cir. 1967). Although a tug is neither a bailee nor an insurer of the tow it is obligated to provide reasonable care and skill "as prudent navigators employ for the performance of similar service." *Stevens v. The White City,* 285 U.S. 195, 202, 52 S.Ct. 347, 350, 76 L.Ed. 699 (1932); *Consolidated Grain & Barge Co. v. Marcona Conveyor Corp.,* 716 F.2d 1077, 1081, (5th Cir.1983); *Agrio Chemical Co. v. M/V Ben W. Martin,* 664 F.2d 85, 90 (5th Cir.1981).

■ The law has harmonized the obligations of the tow and the towing vessel largely through burdens of proof. Where "a barge in tow sinks in calm water for no immediately ascertainable cause . . . in the absence of proof that the barge was improperly handled, the vessel's sinking is presumed to be a direct result of her unseaworthiness," *Consolidated Grain & Barge Co. v. Marcona Conveyor Corp.,* 716 F.2d at 1081.

■ At the same time, the tug cannot complain about a condition of unseaworthiness or other weakness that caused the loss if it knew of the condition and failed to use reasonable care under the circumstances. *Tidewater Marine Activities, Inc. v. American Towing Co.,* 437 F.2d 124, 130 (5th Cir.1970); *Horton & Horton, Inc. v. T/S J.E. Dyer,* 428 F.2d 1131, 1134 (5th Cir. 1970); *Bisso v. Waterways Transportation Co.,* 235 F.2d 741, 745 (5th Cir.1956). If the alleged unseaworthiness is so apparent that it would be negligent for the tow to attempt to proceed, it cannot disclaim responsibility for the loss. *Damaron-White Co. v. Angola Transfer Co.,* 19 F.2d 12, 14 (5th Cir.1927); *Otto Candies, Inc. v. Great American Insurance Co.,* 221 F.Supp. 1014, 1018 (E.D.La.1963) *aff'd.* 332 F.2d 372 (5th Cir.1964). As the district court recognized, King Fisher had the burden of proving Newpark negligent. *See Consolidated Grain & Barge Co. v. Marcona Conveyor*

*Corp.,* 716 F.2d at 1082. *Nat G. Harrison Overseas Corp. v. American Tug Titan,* 516 F.2d 89, 94 (5th Cir.1975). In admiralty, findings of proximate cause and negligence are reviewed under the clearly erroneous standard. *Consoldiated Grain & Barge Company v. Marcona Conveyor Corp.,* 716 F.2d at 1082.

■ Because Newpark knew of the open manhole and cracks on the ship's surface and there is no other evidence that the barge was unseaworthy, the district court's refusal to find King Fisher negligent was not clearly erroneous. The barge had carried a heavy load of steel without apparent difficulty. An internal compartment checked by King Fisher looked fit and the barge was not heeling. LeBouef watched the barge for a day and a half and found no change in its freeboard and thought her seaworthy. While the district court necessarily found that the water entered the unbolted manhole and assorted cracks on the barge's surface, these cracks cannot be relied upon as breaches of the warranty that the barge was seaworthy because Newpark, through LeBouef, was aware of the condition.

■ Theriot and LeBouef testified that water could have entered the manhole cover and cracks that they had seen. Newpark in its brief admits that it is not known whether water which might have seeped into the pontoons could fill the barge. Newpark's own statement to the Coast Guard stated "barge sank-no hatch covers in place" and recommended "secur[ing] hatches on barges before moving." It appears that Newpark knew it was possible for water to seep into the manhole and cracks even though there was Styrofoam below. Newpark then took the barge into the Gulf of Mexico in tow of a tug whose spotlight could not accurately focus on the barge's freeboard unless the tug altered its course. Moreover, the Sunbonnet towed the barge at speeds which caused water to cover the deck of the barge. It was not until the bow was submerged that Newpark slowed and began moving toward shallower waters. Even at this point, Newpark had almost one hour in

which to secure a buoy to the line or prepare to do so in case it became necessary to cut the line due to the complete submersion of the barge. When the barge did sink, Newpark did not try to gain slack in the line by reversing the engines of the tug but instead immediately cut the line. Of course it is within the captain's discretion to cut a line to a barge when the tug and its crew are in danger but this captain went back to sleep with no plans to reverse the tug if it appeared that the barge was submerging or to fix a buoy to the line if it had to be cut. In sum, the district court's findings that Newpark was negligent and its refusal to find the barge unseaworthy were not clearly erroneous.

### III

Newpark also claims that the district court's damage award of $232,996.75 is excessive. King Fisher purchased the barge on February 13, 1979, for $30,000 although it had been advertised for $35,000. He then contracted with Newpark to tow the barge across the Gulf of Mexico and insured the barge against the perils of the journey for $50,000. The barge was lost on February 15, 1979.

King Fisher did not find a suitable replacement barge until November 1979. There was uncontroverted expert testimony that the first barge was ideally suited as a drydock platform; that only six other similar mats existed in the world; and that none of them had been on the market since the loss of King Fisher's barge. Similarly, there was evidence that a new barge of similar specifications would cost one million dollars to build and that combining smaller barges into a barge similar to the one lost would cost King Fisher approximately $600,000. The replacement barge also cost $30,000 but it had a hole which the court found King Fisher paid $202,996.75 to patch in April 1981. Finally, there was uncontroverted expert testimony that the cost incurred by King Fisher to modify the replacement barge to make it similar to the first was reasonable and that King Fisher's efforts were the most economical way to obtain a drydock base. In sum the district court awarded the cost of a replacement barge capable of the same use as the lost barge.

### IV

It is fundamental that when a vessel is lost or damaged "the owner is entitled to its money equivalent, and thereby to be put in as good a position pecuniarily as if his property had not been destroyed." *Standard Oil Company v. Southern Pacific Company,* 268 U.S. 146, 155, 45 S.Ct. 465, 466, 69 L.Ed. 890 (1924). To further this policy courts have long held that where a vessel is a total loss the measure of damages is the market value at the time of the loss. *Id.* at 155, 45 S.Ct. at 466. Where there are insufficient sales to establish a market other evidence such as replacement cost, depreciation, expert opinion and the amount of insurance can also be considered to determine the value of the lost vessel. *See Greer v. United States,* 505 F.2d 90, 93 (5th Cir.1974); *Carl Sawyer, Inc. v. Poor,* 180 F.2d 962, 963 (5th Cir.1950).

Newpark claims the evidence establishes that the market value of the barge was $30,000 because that is what King Fisher paid for it in an arm's length sale only two days before it was lost. As far as it goes, the argument is unassailable. The difficulty is that the barge was not purchased to perform as a barge. It was instead purchased for use as a drydock platform. The barge's price in the barge market is not determinative of its value because its unique capabilities made it valuable for use other than as a barge. The district court found that no "accurate market price" could be determined for this barge and uncontroverted expert testimony supported that conclusion. There was testimony that similar barges so readily transformed into drydocks were not then or have since been available. Indeed, King Fisher testified that he looked for several years before he found the now lost barge. King Fisher's expert testified that only one drydock a year is built and although it would cost $1,000,000 to build a new barge similar to

the one lost, it might "not sell ... for a dime." When King Fisher bought the barge he appears to have been the only one in the market for such a drydock platform. That the market did not value the barge's use as a drydock platform was supported by the fact that King Fisher paid $30,000 for a replacement barge that could not be used as the drydock platform without considerable modification. The district court correctly found that the price paid by King Fisher for the now lost barge did not represent its value as a drydock platform.

The limited number of relevant cases support the decision of the district court. In *Boston Iron & Metal Co. v. S.S. Winding Gulf,* 85 F.Supp. 806, 1949 A.M.C. 1149 (D.Md.1949) *aff'd* 209 F.2d 410 (4th Cir. 1954), *reversed on other grounds* 349 U.S. 122, 75 S.Ct. 649, 99 L.Ed. 933 (1955), Boston Iron had recently purchased an obsolete ship to use as scrap. It sank while being towed from its place of purchase to Boston Metal's facility. The tow urged that the value of the lost ship was its recent purchase price plus the cost of tow. Boston Iron replied that as scrap the ship was worth much more. The court found that given the limited number of opportunities to purchase such ships and Boston Iron's special skill in the field that it had been able to purchase the ship at a bargain and that Boston Iron should be reimbursed for the loss incurred.[1] The court noted difficulties in Boston Iron's method of computing the ship's scrap value and did not award the total claimed, but it did award substantially

more than the cost of the lost ship and towage to Boston Iron. Similarly, in *American Mail Line, Ltd. v. Skagit River Navigation and Training Co.,* 91 F.2d 835, 844 (9th Cir.1937) (*The President Madison*), the lost boat had qualities that were valued in its local Skagit River environment but it was the only such boat. The court refused to find that the market price was the price for which it could be sold on the Columbia River, because those purchasers did not have the same needs and would not fully value the ship's worth. The price established by others with different needs "could not give the owner, who needs these special features in his trade, the value of what he had lost." *Id.* 91 F.2d at 844. *See also Lockwood v. Motor Boat Spitfire II,* 1926 A.M.C. 1185, 1189 (E.D.S.C.1926).

Newpark cites *United States v. Toronto, Hamilton & Buffalo Navigation Co.,* 338 U.S. 396, 402, 70 S.Ct. 217, 221, 94 L.Ed. 195 (1949) for the proposition that the value of the drydock is what an "ordinary purchaser" would have paid for the barge. While the Court did not elaborate on its definition of ordinary purchaser it noted that when considering the price that could have been obtained for the lost vessel the court should consider what an ordinary seller *in the trade* would do. *Id.* at 406, 70 S.Ct. at 223. The price an ordinary drydock purchaser would have paid is the object of our inquiry. King Fisher established that there was no market for drydock platforms created by ordinary drydock purchasers.[2]

---

1. We quote at length from the district court: "In applying this rule it seems clear to me that to the owner this destroyer at the time of loss had a value substantially greater than its cost to the libellant. As a practical test I think the evidence fairly leads to the view that considering all of the relevant facts some person engaged in a similar business would fairly have been willing to pay for the destroyer as an entity at the time and place of loss substantially more than what it cost the owner up to that time. It must be remembered that the purchase was made by one skilled in the particular business taking advantage of a particular opportunity not often afforded, and resulting from skill and knowledge of when, why and how to buy. Or, in other words, it may be said that the evidence as a whole fairly indicates that in

the purchase the owner made a very good bargain and is entitled under the circumstances of the loss to have the damages fixed at a sum which would fairly pecuniarily reimburse him for the loss incurred." *Boston Iron & Metal Co. v. S.S. Winding Gulf,* 85 F.Supp. at 812.

2. Newpark's reliance on *A & S Transportation Co. v. Tug Fajardo,* 688 F.2d 1 (1st Cir.1982) to support its contention that King Fisher should bear the burden of insuring against the uniqueness of the lost boat is misplaced. In *A & S* the court awarded A & S the value of its barge after it was totally lost due to the negligence of the tug. The court, however, refused to award costs incurred by A & S due to lack of use of the barge because of its inability to procure a substitute barge to meet commitments to customers even though the barge was allegedly

■ Here the lost barge had special qualities as a base for a drydock that filled legitimate commercial needs that would not be recognized in the "market" price of the barge. While the barge may only have been a large steel box to some, King Fisher recognized and took advantage of an opportunity to purchase a suitable drydock platform at low cost. The value of the barge was not reflected by its cost to King Fisher. The district court was not clearly erroneous in awarding King Fisher the value of its lost barge measured by its cost of replacement.

## V

■ Newpark also claims that the district court improperly modified its opinion. When the district court originally awarded King Fisher $232,996.75 plus interest it stated that the market value of the lost barge was $30,000. In response to Newpark's motions for rehearing and new trial the district court modified its opinion to conclude that the lost barge had no market value. The district court's modification of its opinion to clarify its analysis of its damage award in response to Newpark's motions for new trial was proper under Rule 59 of the Federal Rules of Civil Procedure.[3] *See e.g., United States v. Hollis,* 424 F.2d 188, 191 (4th Cir.1970).

## VI

Finally, Newpark claims that the district court's award of interest on the full $232,996.75 from the date of the loss of the barge was error. Newpark notes that King Fisher did not spend the $30,000 for the replacement barge until November 1979 and it did not begin to spend the $202,996.75 for repairs until April 1981.

■ In admiralty interest is usually awarded from the date of the loss of the vessel. Prejudgment interest is not awarded as a penalty but as compensation for the use of money by the defendant to which the plaintiff is entitled. *Noritake Co. v. M/V Helenic Champion,* 627 F.2d 724, 728 (5th Cir.1980); *Socony Mobil Oil Co. v. Texas Coastal & International, Inc.,* 559 F.2d 1008, 1014 (5th Cir.1977); *In re Vulcan,* 553 F.2d 489, 490 (5th Cir.), *cert. denied* 434 U.S. 855, 98 S.Ct. 175, 54 L.Ed.2d 127 (1977).

■ The generally established rule is that in a case of total loss the owner is not compensated for the loss of use of the boat. *See A & S Transportation, Inc. v. Tug Fajardo,* 688 F.2d at 2; *The Umbria,* 166 U.S. 404, 422, 17 S.Ct. 610, 617, 41 L.Ed. 1053 (1897). The owner is made whole by receiving the value for the boat at the time of its loss and interest compensates for the owner's time value of money. *The President Madison,* 91 F.2d at 846.

■ The district court refused to award damages for the expenses incurred by King Fisher for repair work to other vessels that might have been performed on the first barge had it been converted to a drydock. Instead, it awarded interest on the value of the barge from the date of the loss. That King Fisher spent money at a later time to replace the barge did not change the fact that King Fisher was deprived of the value of his first barge and in that sense defendant had the use of the funds to which King Fisher was entitled. The district court's award of prejudgment interest was not an abuse of discretion.

AFFIRMED.

---

"unique." While damages for "loss of use" of the barge were originally at issue here, they were denied by the district court, see discussion *supra. A & S* is useful in analyzing the question of awarding loss of use but it did not discuss the method used to determine the value of the lost barge and does not support Newpark's claim.

**3.** Rule 59(a)(2) provides in part: On a motion for a new trial in an action tried without a jury, the court may open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and direct the entry of a new judgment.