Joseph Randolph COLLIER, Plaintiff,

v.

3–A'S TOWING COMPANY, INC., Defendant.

Civ. A. No. 85–1115–T.

United States District Court,
S.D. Alabama, S.D.

Jan. 29, 1987.

J.W. Goodloe, Jr. & J. Marshall Gardner, Mobile, Ala., for plaintiff.

S. Daniel Meeks, New Orleans, La., G. Hamp Uzzelle, Jr., Mobile, Ala., for defendant.

DANIEL HOLCOMBE THOMAS, Senior District Judge.

This non-jury case was heard on December 11th and 12th, 1986. After careful review of all the evidence and all documents which were submitted by each side,

the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. The plaintiff, Joseph Randolph Collier (Collier), is a citizen of the State of Alabama, residing in Alabama.

2. 3–A's Towing Co., Inc. (3–A's), the defendant, is a corporation organized under the laws of the State of Louisiana with its principal place of business being in Venice, Louisiana.

3. Collier was the owner of a wooden hull shrimp trawler, the F/V EVELYN K, which was 53.4 feet in length, 17.0 feet in breadth and 6.0 feet in depth.

4. The F/V EVELYN K was purchased by Collier in November 1981. He paid the seller $38,000.00 in cash and traded a fishing boat called the F/V INNERSPREE. Collier valued the F/V INNERSPREE at $20,000.00. This was based upon the fact that Collier had recently purchased the F/V INNERSPREE for $18,000.00 and subsequently performed repairs and improvements on the vessel. The Court finds the total price paid by Collier for the F/V EVELYN K in November of 1981 was $58,000.00.

5. This action arises from the sinking of the EVELYN K on September 4, 1984. The EVELYN K sank while being towed in a "hip tow" from Venice, Louisiana, to Bayou La Batre, Alabama. The vessel was being towed to Bayou La Batre because its engine had "blown up". The sunken vessel could never be located.

6. The plaintiff purchased various electronics, nets, rope and cable, the value of which was at least over $5,000.00, in order to equip the vessel after it was purchased.

7. At the time she sank the EVELYN K was 39 years old. Testimony produced at the trial indicates the maintenance of a wood-hull vessel is more important than its age.

8. The EVELYN K was overhauled by Landry Boat Works in Bayou La Batre on January 7–8, 1983. She was hauled out of the water and the hull was checked and recaulked. Also, the hull was painted and the vessel's propellers and shafts were repaired and realigned.

9. When the EVELYN K left Landry Boat Works in January 1983, she was seaworthy and fit to be used for her intended purpose.

10. Joe Landry, the owner of Landry Boat Works, testified that he was very familiar with the wooden boat market. Landry stated in his opinion, the EVELYN K had a fair market value of $50,000 to $55,000 in January 1983. Landry testified that the fair market value of the vessel on September 4, 1984, the date it sank, would have been essentially the same as it was in January of 1983.

11. In late August 1984, the EVELYN K threw a rod in its engine while shrimping off the Louisiana Coast. The vessel was towed to Venice, Louisiana. But for the engine, she was seaworthy at this time and was not experiencing any leaking problems.

12. There was evidence that the cost of repairing the engine ranged between $1,500 and $7,500.

13. Collier contacted Harold Adams of 3–A's on September 3, 1984, concerning towing the vessel from Venice to Bayou La Batre, where her engine was to be repaired for the approximate price of $1,500.00. Harold Adams is, and was at all pertinent times, one of the owners of 3–A's. Adams and Barry Bartholomew, a captain employed by 3–A's, checked the EVELYN K out and found her to be fit for towing. Water which was found in the bilge was considered normal and 3–A's was not hesitant about towing the vessel to Alabama.

14. Shortly after the 3–A's inspection, the 3–A's tug, M/V JENNIE D was dispatched to tow the EVELYN K to Bayou La Batre. The JENNIE D is a twin screw steel hull push boat. Bartholomew was Captain of the JENNIE D and Gustave Roberts served as mate. There were no other members aboard. There is a dispute as to whether 3–A's was supposed to have supplied another crew member for the tow-

ing operation or if one of the EVELYN K's crew was supposed to have stayed with the vessel during the tow. But there is no dispute that there should have been another person to aid in the towing operation.

15. Upon arriving to tow the EVELYN K, Bartholomew apparently inspected the vessel again and found that it was fit to be towed. The Court finds that both Adams and Bartholomew of 3-A's had ample opportunity to inspect the vessel prior to undertaking the tow. Also, the Court finds that once 3-A's accepted the towing job, it took the EVELYN K as it found her.

16. 3-A's made the tow up in a "hip tow" configuration wherein the port side of the JENNY D was secured to the starboard side of the EVELYN K. Bartholomew secured the fishing vessel to the tug boat with four lines: a head line, a stern line and two "jacket" lines. There were tires which were 10 inches in width that served as fenders on the port and starboard sides of the EVELYN K. The reason the vessels were arranged in the "hip tow" fashion, as opposed to towing the EVELYN K on a line, was that Bartholomew did not have anyone available to ride on board the EVELYN K and he felt it would be imprudent to tow a vessel on a line without a man being present on the towed vessel. Although Bartholomew initially thought that someone would meet him at the beginning of the voyage to board the EVELYN K, no one was available. Bartholomew called Adams, his boss, by radio to advise of this problem. Adams ordered Bartholomew to "just go ahead and take the boat" without an additional hand. [Bartholomew's deposition page 80].

17. At approximately 6:00 p.m. on September 3, 1984, the steel hull JENNY D departed Venice for Bayou La Batre with the wooden hull EVELYN K abreast on a "hip tow". The two man crew of Bartholomew and Roberts remained unchanged. Bartholomew estimated that the trip to Bayou La Batre would take approximately two and one-half days and that on a trip lasting longer than a couple of days, a third crew member would usually be required.

A normal crew complement for the JENNY D would be three according to Bartholomew.

18. At approximately 5:30 a.m. on September 4, 1984, the JENNY D arrived at or near the mouth of the Pearl River. Bartholomew boarded the EVELYN K and checked the hold. He found no indication that the vessel was leaking and found nothing that caused him any concern. Accordingly, he prepared to enter the open waters of the Mississippi Sound.

19. Approximately one-half hour later, around 6:00 a.m., Bartholomew once again boarded the EVELYN K and found that water was leaking through the seams of the vessel. Nonetheless, the tow continued its voyage in the open waters of the Mississippi, when it could have headed for more shallow waters. For the next two and one-half hours the JENNY D continued underway despite this leaking condition which was known to the Captain. Finally, at approximately 8:30 a.m., two and one-half hours after first noticing that the EVELYN K was taking on water, Bartholomew contacted the 3-A's office by radio and inquired as to the location of the bilge pump switch. Upon being informed of its location, Bartholomew switched the pump on. However, by that time the water level in the EVELYN K was over the shaft. It was simply too late.

20. Next, Bartholomew took a two-inch gasoline powered jigger pump from the tug and placed it on board the EVELYN K. The pump had a suction line approximately six or seven feet long, but it had no discharge hose. As a result, the water was discharged directly onto the deck. Some of the water ran back into the engine room from which it was being pumped. This pumping was inefficient.

21. At approximately 9:30 a.m. to 9:45 a.m., Bartholomew ordered his Mate, Roberts, to cut the lines which were securing the EVELYN K to the JENNIE D. Subsequently, the EVELYN K rolled over onto her side. The EVELYN K sank about one-fourth mile west of Cat Island in about fifteen feet of water.

22. The sinking of the wooden hull EVELYN K was caused by the vessel being towed by the steel hull JENNIE D in a "hip tow".

23. Captain Bartholomew testified by deposition, in his opinion, the pressure of the water being forced between the two varying (one wood and one steel) hulls was the initial cause of the water leaking into the EVELYN K. Bartholomew went on to state, if the EVELYN K had been towed in a "line tow" rather than in a "hip tow", it never would have sunk. Bartholomew also testified that his father owned a wooden shrimp boat and that he would never tow his father's boat in a "hip tow". He added the reason he towed the vessel in question in a "hip tow" was because he was just following his boss' orders.

24. J.B. Kleinpeter, a towing expert, testified on behalf of the plaintiff. Kleinpeter agreed with Bartholomew's assessment that there should have been a third crew member on board. Kleinpeter also noted the following deficiencies in the actions of the JENNY D and her crew:

(a) It was imprudent to tow the EVELYN K unmanned;

(b) It was imprudent for the Captain to be unfamiliar with the bilge pump switch location on the EVELYN K;

(c) It was imprudent for the Captain to continue running the tow for over two and one-half hours after first noticing the leaking;

(d) The Captain should have taken the Evelyn K into shallower water once he noticed the leaking; and

(e) The jigger pump carrier by the JENNY D was inadequate because it did not have a discharge hose.

25. The plaintiff upon trying to locate the vessel after it sank, in an effort to have it salvaged, was unsuccessful in locating the EVELYN K.

26. Since 3–A's chose a negligent manner in which to tow the vessel in question and considering the fact that a tower takes a vessel which is to be towed, as he finds it; this Court finds the defendant, 3–A's, to have been negligent and 100% at fault in this occurrence.

27. After taking all the evidence into consideration, this Court finds that the fair market value of the EVELYN K on September 4, 1984, prior to its sinking was $50,000.00.

The Court further notes with the exception of the damaged engine, the vessel had been properly maintained and at the time of sinking was in essentially the same condition as she was in when hauled out by Landry. The Court also notes, Collier had purchased the M/V EVELYN K in 1981 for a total price of $58,000.00, that Collier was a seasoned and experienced boat buyer and that Collier valued the vessel before it sank at $70,000.00. The Court also takes into consideration the fact that Collier had purchased new electronics and replacement fishing gear and placed it aboard the vessel prior to its sinking. The new electronics added to the value of the vessel, while the replacement fishing gear helped to maintain the boat's value.

28. To the extent any of these Findings of Fact constitute Conclusions of Law, they are hereby adopted as both.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over this admiralty action based on 28 U.S.C. § 1333 and Rule 9(h) of the Federal Rules of Civil Procedure. This Court, also, has jurisdiction over this matter by virtue of diversity of citizenship. 28 U.S.C. § 1332.

2. In a contract of towage the tug is neither a bailee nor insurer of the tow. However, the tug owes the tow the "duty to exercise such reasonable care and maritime skill as prudent navigators employ for the performance of similar service." *Stevens v. The White City*, 285 U.S. 195, 202, 52 S.Ct. 347, 350, 76 L.Ed. 699, 703 (1932), *King Fisher Marine Service, Inc. v. NP Sunbonnet*, 724 F.2d 1181, 1184 (5th Cir. 1984).

3. The tug's duty to the tow "includes the requirement to assess the nature of the undertaking that it assumes; it must

be sufficiently knowledgeable about its vessel, its customer's ship and the interaction of the two upon the sea...." *M.P. Howlett, Inc. v. Tug Dalzellido*, 324 F.Supp. 912, 917 (S.D.N.Y.1971).

■ 4. "A tug crew is obligated to become familiar with and competent to operate the equipment aboard its tow", in particular a ballast pumping system. *Dow Chemical Co. v. M/V Gulf seas*, 428 F.Supp. 667, 672 (W.D.La.1977).

■ 5. In the present case, the evidence is clear that the tug violated many of its duties to the tow. Some of the negligent and imprudent actions were:

(a) The Captain of the JENNY D made up a "hip tow".

(b) There was an insufficient number of crew aboard.

(c) The Captain failed to become familiar with the bilge pumping equipment.

(d) The Captain failed to take appropriate action after the noticing that the EVELYN K was taking on water.

■ 6. The rule of law is that the owner of the tow has a duty to furnish a seaworthy vessel. *King Fisher Marine Service, Inc. v. NP Sunbonnet*, 724 F.2d at 1183 (5th Cir.1984); *S.C. Loveland, Inc. v. East West Towing, Inc.*, 415 F.Supp. 596, 605 (S.D.Fla.1976), aff'd, 608 F.2d 160 (5th Cir.1979), cert. denied, 446 U.S. 918, 100 S.Ct. 1852, 64 L.Ed.2d 272 (1980). The Court finds the plaintiff sustained this burden.

7. A "tug cannot complain about a condition of unseaworthiness or other weakness that caused the loss if it knew [or had reason to know] of the condition and failed to use reasonable care under the circumstances." *King Fisher Marine Service, Inc. v. NP Sunbonnet*, 724 F.2d at 1184 (5th Cir.1984); *Tidewater Marine Activities, Inc. v. American Towing Co.*, 437 F.2d 124, 130 (5th Cir.1970).

■ 8. The owner of a vessel which is a total loss is entitled to that amount of damages which will put him in as good a position as if his property had not been destroyed. *Standard Oil of New Jersey v.*

*Southern Pacific Co.*, 268 U.S. 146, 155, 45 S.Ct. 465, 466, 69 L.Ed. 890 (1925). The usual and customary method of determining damages when a vessel is a total loss is the market value of the vessel at the time of the loss. *Carl Sawyer, Inc. v. Poor*, 180 F.2d 962 (5th Cir.1960). Where there are too few sales to establish a particular market "other evidence, such as replacement cost, depreciation, expert opinion" and any other factors which the Court deems relevant, can also be considered to determine the value of the lost vessel. *King Fisher Marine Service, Inc. v. NP Sunbonnet*, 724 F.2d at 1185 (5th Cir.1984); *See, Greer v. United States*, 505 F.2d 90, 93 (5th Cir. 1974).

■ 9. The plaintiff is entitled to recover $50,000 from the defendant, plus prejudgment interest of 10% and post judgment interest of 5.75%. Where prejudgment interest is granted for breach of a maritime contract, it is calculated from the time the cause of action accrued, *Johnson Barge Co. v. Mid Valley, Inc.*, 243 F.Supp. 234, 237 (S.D.Tex.1963), here the date on which the EVELYN K sank, September 4, 1984.

In admiralty, prejudgment entered should generally be awarded. *Miller Industries v. Caterpillar Tractor Co.*, 733 F.2d 813 (11th Cir.1984). In setting the rate of prejudgment interest under federal maritime law, courts exercise a "broad discretion," *Gator Marine Services Towing, Inc. v. J. Ray McDermott and Co.*, 651 F.2d 1096, 1101 (5th Cir.1981).

10. To the extent any of these Conclusions of Law constitute Findings of Fact, they are hereby adopted as both.

In accordance with the above Findings of Fact and Conclusions of Law, a Judgment will be entered forthwith.

## JUDGMENT

Pursuant to the Findings of Fact and Conclusions of law entered this date, it is ORDERED, ADJUDGED and DECREED that a Judgment in the amount of FIFTY

THOUSAND AND NO/100 DOLLARS ($50,000.00) be, and hereby is, entered in favor of the plaintiff, Joseph Randolph Collier, and against the defendant, 3–A's Towing Company, Inc., together with prejudgment interest at the rate of 10% per annum from September 4, 1984, to date, and post judgment interest at the rate of 5.75% per annum, from date of Judgment until paid.

Costs are taxed against the defendant.