DAVID S. GORBATY, Judge.
Fishbones, Inc., appeals a judgment wherein the trial court awarded damages of $275,000, plus pre-judgment interest from the date of the incident, and costs for the loss of the vessel, MW DISCOVERY, after it was destroyed while being towed by a vessel owned by Southern Boat Service of Louisiana, Inc. Fishbones, Inc., alleges trial court error for not awarding damages for the destruction of Fishbones, Inc.’s business, and for awarding too little in compensation for the loss of the vessel. For the following reasons, we affirm.
FACTS AND PROCEDURAL HISTORY:
Plaintiff/appellant is Fishbones, Inc. (hereinafter Fishbones), a corporation organized by James Ingram. Mr. Ingram, on behalf of Fishbones, purchased the M/V DISCOVERY and converted it to a “floating hotel” for the purpose of hiring the boat out to sport fishermen. Defendant Southern Boat Service of Louisiana, Inc. (hereinafter Southern Boat), was hired to tow the M/V DISCOVERY from Venice, Louisiana, to Breton Island.
LThe parties stipulated to the following facts prior to trial, and the trial court accepted the stipulations, making them part of the findings of fact:
1. On or about May 5, 2001 [1], Southern Boat, and its owner/operator, Mr. John Bonvillian, with the M/V ST. JOHN tug boat, undertook a contract of towing the M/V DISCOVERY, owned and operated by plaintiff, Fishbones, a Louisiana corporation.
2. The contract of towage began at Venice, Louisiana, in Plaquemines Parish.
3. During the tow the M/V ST. JOHN beached the M/V DISCOVERY on the windward side of Breton Island where the M/V DISCOVERY was sunk and destroyed by wave action from the Gulf of Mexico.
4. At the time of the towage, beaching and destruction of the M/V DISCOVERY, the defendant, Southern Boat had in full force and effect a policy of liability insurance with defendant Great American Insurance Company, which insured Southern Boat for the type of negligence and damages complained of by plaintiff in this case, which certified copy of said insurance policy is the best evidence of its terms and conditions.
5. As a result of the destruction of the M/V DISCOVERY, Fishbones filed a law *806 suit against Southern Boat and Great American Insurance Company in the 25th Judicial District Court for the Parish of Plaquemines, State of Louisiana.
6. Southern Boat and Great American Insurance Company stipulated to liability regarding the damages to Fishbones as a result of the defendants’ conduct. Therefore, the only issue to be tried and decided at trial was the amount of damages.
7. Plaintiff and defendants stipulated prior to trial that the cost of salvaging the remains of the M/V DISCOVERY was $30,000.00.
8. Plaintiff and defendants stipulated prior to trial that the value of the companion boats lost was $19,372.00.
9. Southern Boat was licensed to do and doing business in Plaquemines Parish on or about May 5, 2001, and at the time this lawsuit was filed.
10. Southern Boat had its principal place of business in Plaquemines Parish, on or about May 5, 2001, and at the time this lawsuit was filed.
According to the further findings of fact by the trial court, during the tow the weather changed drastically and the seas became rough. Because of the rough seas, the M/V DISCOVERY became beached on the windward side of Breton Island. During the recovery attempt, the M/V ST. JOHN incurred a hole in her hull, requiring Mr. Bonvillian, the captain, to abort his attempts to rescue the M/V DISCOVERY. The M/V DISCOVERY subsequently sank and broke up.
Because the parties stipulated to liability, the only issue to be decided by the trial court was the damages incurred by Fish-bones as a result of Southern Boat’s negligence.
|4DISCUSSION:
Fishbones assigns as error the trial court’s failure to award it damages for the total destruction of its business as a result of the loss of the business’s only vessel. The trial court awarded Fishbones replacement value and value of contents for the total destruction of its vessel, the M/V DISCOVERY. Fishbones argues that total destruction of business is a type of damage distinct from lost profits, which it admits is not recoverable under general maritime law. Fishbones contends, however, that the situation herein is unique because its entire business was so inextricably linked to its one vessel, that the destruction of that vessel destroyed the entire business. Thus, because total destruction of business is not the same type of damage as lost profits, and, because general maritime law does not address recovery of this type of damage, the trial court erred in not looking to Louisiana state law for guidance.
Specifically, Fishbones claims that the trial court erred as a matter of law because jurisprudence provides that if there are no specific provisions under general maritime law to address a particular type of damage, a state trial court may consider Louisiana law. Citing Green v. Industrial Helicopters, Inc., 593 So.2d 634 (La.1992), Fishbones argues “a Louisiana court should respect Louisiana law unless there is some federal impediment to application of that law contained in federal legislation or a clearly applicable rule in the general maritime law.” Id. at 638. Fishbones contends that there exists no such impediment or contrary general maritime rule. Applying a three-step inquiry established by the Louisiana Supreme Court in Green, supra at 639, Fishbones argues that there is no congressional pronouncement precluding an award for total business destruction. Further, although Fish- *807 bones acknowledges that general maritime law is clear on what type of damages are available with respect to total loss of a vessel, it argues that federal law does not provide guidance with regard to damages for total loss of a business. In other words, Fishbones argues that “total destruction of business” is not one of the types of damages encompassed by the total loss of a vessel rule. Last, Fishbones acknowledges that the need for uniformity in general maritime law normally bars the application of state law, but argues that courts frequently supplement general maritime law with state law when the state law provides additional tort remedies not available under federal law. Citing Green, supra at 642.
Southern Boat counters that state law does not apply to the facts of this case because federal maritime law clearly provides that consequential damages such as loss of use or lost profits are not available when the vessel is deemed a total loss. The reasoning behind this rule is that “the owner is made whole by receiving the value of the boat at the time of loss and interest compensates the owner’s time value of money.” King Fisher Marine Serv., Inc. v. NP Sunbonnet, 724 F.2d 1181, 1187 (5th Cir.1984). Southern Boat argues that Fishbones’ attempt to distinguish its business destruction claim from a claim for loss of use of the vessel is meritless. The destruction of business claim is damage consequential to the loss of the vessel, hand consequential damages are not available when the vessel is deemed a total loss.
According to maritime law, when a vessel is damaged in a maritime casualty, the amount of recovery depends on whether it is deemed a total loss or whether its partial damage can be economically repaired. Gaines Towing and Transp., Inc. v. Atlantia Tanker Corp., 191 F.3d 633, 636 (5th Cir.1999). A vessel is a total loss when it sinks -with no salvage practical. A vessel is considered a constructive total loss when the cost of repairs exceeds the fair market value of the vessel immediately before the casualty or after the repairs. Ryan Walsh Stevedoring Co., Inc. v. James Marine Services, Inc., 792 F.2d 489, 491 (5th Cir.1986). When a vessel is deemed a total loss, the ceding on recovery is the market value of the vessel, that is, the value of the vessel at the time and place of its loss, the value of the freight pending at its loss, and interest on those two amounts from the date of loss. Standard Oil Co. of N.J. v. So. Pacific Co., 268 U.S. 146, 155, 45 S.Ct. 465, 466, 69 L.Ed. 890 (1925); Pizani v. M/V Cotton Blossom, 669 F.2d 1084, 1088 (5th Cir.1982); O’Brien Bros. v. The Helen B. Moran, 160 F.2d 502, 505 (2d Cir.1947). Because the potential profits give value to the vessel, a shipowner cannot recover the lost profits from a charter. The Owners of Dredger Liesbosch v. The Owners of Steamship Edison (1933), A.C. 449 (U.K.) Lost profits may not be awarded separately because they are accounted for in the damage formula in both the value of the vessel and the interest rate. In re Complaint of Seabulk Offshore, Ltd., 212 F.Supp.2d 696, 697 (S.D.Texas 2002). The value of the vessel includes the value of her future contribution to work. Id. at 697-698.
Fishbones is seeking to distinguish the facts of its case from other cases in which vessels were deemed total losses. It reasons that because the WV DISCOVERY was the only vessel owned by the company, the loss of that vessel destroyed the business. While that may be true, that fact alone is not sufficient to distinguish this case such that Louisiana law should apply. Federal maritime law is clear that the loss of profits, regardless of whether those profits constitute partial profits of a business or the entire projected profits, is *808 considered when valuing the vessel, and recovered in the pre-judgment interest assessed. There is no separate recovery allowed for' destruction or total loss of business.
Fishbones seeks to recover under a seldom-recognized tort theory in Louisiana law because the facts of this case are unique. Fishbones has not cited any case law to support its theory that because its only boat was lost due to another’s fault, it should be able to recover for destruction of the business in addition to the loss of the boat. The fact that Fishbones only had one boat in its “fleet,” and the loss of that boat put an end to the business, does not trigger application of Louisiana law.
Southern Boat also argues that the type of damages sought by Fishbones is not an additional tort remedy such that Louisiana law should apply. See Green, supra at 642. Federal law already provides for recovery of consequential damages, e.g., lost profits, goodwill, etc., and, therefore, recovery of damages for total loss |sof a business would create a conflict between federal and state law. Fishbones readily agrees throughout its brief that such conflict would not pass muster under the inquiry enunciated by the Louisiana Supreme Court in Green, yet insists that the facts of this case are different and unique.
The Green court, cited by Fishbones in support of its argument that the facts of this case require deviation from the general rule, noted that the uniformity rule in general maritime law is sometimes tempered with the recognition that in some matters local concerns outweigh the federal need for a uniform admiralty rule. Green, supra at 643. For that reason, the “maritime but local” rule emerged. The rationale behind this rule was that “[i]f it [can] be said that the work activities of the injured employee [have] no direct concern with navigation or commerce, it [is] ‘local’ and therefore the State laws [are] applicable.” Id., citing M. Norris, The Law of Maritime Personal Injuries, 4th Ed., § 4:6 at 117 (1990).
Examples of cases where the “maritime but local” rule have been applied include Askew v. American Waterways Operators, Inc., 411 U.S. 325, 93 S.Ct. 1590, 36 L.Ed.2d 280 (1973), wherein it was decided that states may constitutionally exercise their police power concurrently with the federal government regarding maritime activities; Palestina v. Fernandez, 701 F.2d 438 (5th Cir.1983), wherein state law was applied to a case involving a boating accident which occurred on a navigable Louisiana waterway described as a “garden variety state tort claim;” and, Baggett v. Richardson, 473 F.2d 863 (5th Cir.1973), a case involving a fight aboard a vessel that was considered a state tort claim in all other respects.
19The only difference that this Court can ascertain between the myriad of case law explaining how and why damages are awarded for loss of a vessel and the instant case is that in this case the M/V DISCOVERY was Fishbones only vessel. We see no need for the exercise of this state’s police powers, nor is this case a “state tort claim” in all other respects. This is clearly a maritime case not subject to Louisiana law. We do not find that a niche should be carved out to allow a separate type of recovery based on the facts of this case. Accordingly, we do not find that the trial court erred as a matter of law in refusing to apply state law.[2]
*809 In a second assignment of error, Fish-bones argues that the trial court erred in calculating the replacement value of the MTV DISCOVERY. Fishbones claims that the trial court considered improper factors and failed to consider other relevant factors to arrive at the damage award.
King Fisher Marine Serv., Inc. v. NP Sunbonnet, 724 F.2d 1181, 1187 (5th Cir.1984), offers the most guidance with regard to the facts of this case. In King Fisher, the owner of a marine business searched the market for many years looking for a barge suitable for use as a platform for a drydock. When he finally located a barge he thought would be suitable, he thoroughly inspected it prior to purchase. During the inspection, a hole was cut and manhole covers opened to inspect the pontoons and internal compartments. After the inspection was completed, the Imowner’s representative and King Fisher both instructed workers to reweld the hole and manhole covers. Mr. Fisher subsequently purchased the barge and arranged for it to be towed to its new location by Newpark Marine Services, Inc. During the trip, the tug and its tow encountered high seas and the newly purchased barge sank. After finding the barge a total loss and Newport liable, the district court awarded damages.
The district court established that the lost vessel was unique. First, the barge was uniquely suited for use as a drydock platform, and only six other similar barges existed. None of the six were available for sale since the time King Fisher’s vessel sank. To have a similar vessel built from scratch would cost $1 million, and the barge King Fisher eventually bought to replace the sunken barge cost him $30 thousand. However, he had to pay over $200,000 to repair a hole. Thus, because there were insufficient sales to establish a market value for the lost barge, the district court considered other evidence such as replacement cost, depreciation, expert opinion and the amount of insurance to determine the value of the lost vessel. See Greer v. United States, 505 F.2d 90, 93 (5th Cir.1974); Carl Sawyer, Inc. v. Poor, 180 F.2d 962, 963 (5th Cir.1950).
Fishbones argues that the district court in King Fisher recognized that in non-market cases, a court could consider other factors such as depreciation, expert opinion, and amount of insurance, but ultimately awarded replacement value alone. We disagree. The King Fisher court clearly considered several factors to arrive atlnthe replacement value, and, as pointed out by Southern Boat in brief, the court is entitled to look at other relevant factors.
It is to be borne in mind that value is the thing to be found, and that neither cost of reproduction new, nor that less depreciation, is the measure or sole guide. The ascertainment of value is not controlled by artificial rules. It is not a matter of formulas, but there must be a reasonable judgment having its basis in a proper consideration of all relevant facts, (citations omitted).
Standard Oil Co. of N.J. v. So. Pacific Co., 268 U.S. 146, 156, 45 S.Ct. 465, 466, 69 L.Ed. 890 (1925).
After careful review of the jurisprudence, we agree with Southern Boat that the trier-of-fact may use any relevant factors it deems necessary, including replacement cost, to arrive at the market value of the lost vessel. We also agree with Southern Boat that review of a trial court’s findings of fact in a general man- *810 time case filed in state court are subject to the manifest error/clearly wrong standard. Milstead v. Diamond M Offshore, Inc., 95-2446, p. 11 (La.7/2/96), 676 So.2d 89, 96.
After taking the matter under advisement, the trial court issued its judgment and extensive written reasons for judgment. It is abundantly clear from the written reasons that the trial court listened very closely to the testimony and took detailed notes. The trial court considered numerous factors it found relevant to arrive at its judgment. The factors included fair market value, purchase price, replacement cost, depreciation, expert opinion, insurance coverage, a prior survey of the vessel, |13and a United States Coast Guard form completed after the incident. We will address these factors individually.
A. Fair Market Value—
Fishbones argues that because there is no market for the identical type vessel lost, fair market value is an improper factor to consider. Southern Boat agrees that there is no identical vessel available on the market, but argues that there are similar type vessels available whose value can aid the court. Southern Boat offered into evidence a trade publication that included a similar houseboat for sale, and hearsay testimony from the owner of a similar vessel operating in Breton Sound. The trial court admitted that the M/V DISCOVERY was unique, and that arriving at a fair market value was difficult. The trial court agreed with Fishbones that there was insufficient evidence to conclude that a fair market value existed. The court thus looked to other relevant factors to arrive at a figure.
B. Purchase Price—
Mr. Ingram testified that he paid approximately $222,000 to purchase the M/V DISCOVERY in 1996. However, the actual sale price was $144,000. The extra monies paid were to settle litigation in which the seller was involved.
Fishbones argues that the trial court erred in considering the purchase price because it deprives Fishbones of the benefit of its bargain. Further, Fishbones claims the trial court did not consider the approximately $120,000 Mr. Ingram invested in the vessel for improvements after the sale.
|13The trial court awarded Fishbones $275,000 for its loss. This Court cannot determine if the trial court considered the amount of money invested after the sale; however, it is clear the trial court awarded substantially more than the $144,000 Mr. Ingram testified he paid for the vessel. Thus, contrary to Fishbones’ argument, because the trial court did not consider purchase price as the sole basis for the award, we cannot say it erred on this basis.
C.Replacement Cost—
Fishbones argues that the trial court erred in relying more heavily on the testimony of Southern Boat’s expert, Ken Helmrich, than on its expert, Kyle Smith. According to Fishbones, Mr. Helmrich never boarded or inspected the vessel in question prior to the sinking, but had to rely on 6-year-old pictures of the vessel. However, Mr. Smith was onboard the vessel, and, therefore, had firsthand knowledge of its construction. Southern Boat contends that Mr. Smith was only on the boat for unrelated purposes, and not for a firsthand inspection as claimed by Fish-bones. Fishbones also argues that Mr. Helmrich was a “hired gun,” and, therefore, the trial court should have disregarded his testimony. Last, Mr. Helmrich’s figures “were all over the map,” whereas Mr. Smith was consistent in his calculations. Southern Boat contends that its *811 expert has over 32 years of experience as a marine surveyor, and has surveyed hundreds of houseboats. By contrast, Mr. Smith’s experience is in surveying river barges.
It is well settled that a trial court is not bound by the testimony of any expert, but such testimony is to be weighed the same as any other evidence. See Curole v. Curole, 2002-1891, p. 13 (La.10/15/02), 828 So.2d 1094, 1101; Lanosa v. Harrison, 2002-0026, p. 4 (La.App. 4 Cir. 8/7/02), 828 So.2d 602, 605. A trial court may accept or reject in whole or in part the opinion expressed by an expert. Lanasa, supra; Fountain v. Fountain, 93-2176, p. 5 (La.App. 1 Cir. 10/7/94), 644 So.2d 733, 738. The effect and weight to be given to expert testimony is within the broad discretion of the trial court. Lana-sa, supra. After reviewing the testimony and the trial court’s reasons for judgment, it is clear that the trial court carefully evaluated and weighed the testimony of the experts on each item to which they testified. We do not find that the trial court abused its vast discretion.
Fishbones’ marine surveyor, Kyle Smith, testified that the estimated replacement cost of the M/V DISCOVERY would be $692,483. This estimate was based on building a new tri-moran hull on a 120' x 40' deck barge and a new house at $100 per square foot, and installing a new Caterpillar engine, two new generators, four stainless steel tanks and a new water system, and hiring a naval architect to draw plans.
Southern Boat’s marine surveyor, Ken Helmrich, arrived at an estimated replacement cost of $210,664.62. His estimate was based on rebuilding the hull with1// steel at $1 per pound, a Detroit Diesel engine, a new wheel and shaft, one new generator, two stainless steel tanks, a naval architect or other person qualified to draft plans, and a new water system. Mr. Helmrich’s replacement cost was also based on a 30 year straight-line depreciation.
I-i/There was evidence offered that the engine onboard the M/V DISCOVERY was inoperable at the time of the incident, and had been for three years previous. Southern Boat was therefore of the opinion that the cost of a new engine should not be included in the estimate. However, Mr. Helmrich did obtain a price of $30,000 for a new Detroit Diesel, the same as the inoperable engine. Mr. Smith obtained an estimate of $47,142 for a new Caterpillar engine, a significantly more expensive engine than the one originally on the vessel. The trial court noted that although it accepted the testimony as true regarding the engine being inoperable at the time of the incident, neither party offered evidence on whether the engine could have been repaired. The trial court therefore had no information to consider on the cost of possible repair.
However, the trial court also noted that Mr. Helmrich opined that a new wheel and shaft would cost approximately $10,000, whereas Mr. Smith included those items in the total cost of the engine. Thus, the prices estimated by each for a new engine were very close: Smith-$47,142 and Helm-rich-$40,000.
Southern Boat offered uncontradicted evidence that only one generator was on board the vessel at the time of the incident. Therefore, only one generator should be included in the replacement cost. Mr. Helmrich estimated that cost at $18,000. Mr. Smith estimated $30,521.
There was also conflicting testimony surrounding replacement of the four stainless steel tanks. Mr. Smith opined that each new tank would cost $30,000. However, according to a 1996 survey of the *812 vessel, there were only two | ^independent stainless steel tanks; the other two tanks were incorporated into the hull. Therefore, according to Southern Boat’s expert, the two tanks in the hull would be included in the cost of rebuilding the hull. Mr. Helmrich estimated the cost of replacing the two remaining tanks at $30,000.
The parties also disagreed on the need for a naval architect to draw plans for a new vessel. Mr. Smith estimated the cost for a naval architect at $35,000. Mr. Helmrich, however, stated that a marine surveyor such as himself was quite capable of drawing up plans for a vessel like the M/V DISCOVERY, a barge with a house on top. Mr. Helmrich estimated the cost for such plans, whether done by a naval architect or a marine surveyor at $3,200.
The experts also disagreed on the cost of a new water system. Mr. Smith estimated the cost at $20,000 and Mr. Helm-rich at $10,000.
Extensive testimony was taken regarding the cost of replacing the actual houseboat. Needless to say, the two expert were fathoms apart in their estimates. Mr. Smith was of the opinion that it would cost $100 per square foot to replace the housing structure on the barge, but offered very little support for his opinion. Mr. Helmrich estimated it would cost $50 per square foot.
Mr. Helmrich testified that based on his experience surveying and valuing houseboats and his experience actually overseeing the construction of a houseboat, he was of the opinion that the M/V DISCOVERY was not at the upper end of the spectrum. For example, the house itself was wood framed with vinyl siding. The interior had vinyl floors, non-custom cabinets and low quality counter tops. On the|17other hand, Mr. Helmrich compared the M/V DISCOVERY to the M/V MISTER TODD, another houseboat with which he was familiar. The M/V MISTER TODD had aluminum studs and a brick veneer, inlaid tile, custom cabinets, Corian counter tops and carpet. The cost of construction was approximately $100 per square foot.
The parties also disagree on whether the replacement value of the M/V DISCOVERY should be depreciated. Southern Boat argues that it is fundamental that a party should not be placed in a better position than he was prior to the accident. Fishbones again argues that King Fisher, supra, does not mandate a court to consider depreciation. After hearing extensive testimony on this issue, the trial court decided that depreciation was a factor to be considered. The court noted that the experts agreed the M/V DISCOVERY had a life expectancy of 30 years, and was 9 years old at the time of the sinking. There was also evidence produced that the vessel had considerable wear and tear at the time. Whether the replacement value of the vessel should be depreciated was a finding of fact, and we cannot say that it was manifestly erroneous for the trial court to do so.
The trial court also considered insurance coverage as a factor in making its judgment. Fishbones argues that this was improper, because the M/V DISCOVERY was not insured. The evidence produced regarding insurance was an application for insurance submitted 5 years prior to the incident by Mr. Ingram, the owner. He had inquired about hull insurance, and had told the insurance broker that the present day value of the vessel was $200,000. He wanted to insure the hull |18for $150,000. However, Mr. Ingram ultimately decided that the premium was too high, and made the decision not to insure the vessel at all.
The trial court noted that there was no evidence introduced to qualify Mr. Ingram as an expert in valuing vessels; however, *813 the value reported was indicative of what Mr. Ingram felt the vessel was worth to him in 1997. This factor was weighed in light of the fact that at the .time of trial, Mr. Ingram reported the vessel was worth $500,000.
The court also considered a survey of the M/V DISCOVERY conducted in 1996 prior to purchase by Mr. Ingram. The detailed survey indicated that the market value of the vessel at that time was $200,000, and the replacement value was $250,000.
The last item considered by the trial court for determination of replacement value was a United States Coast Guard form completed by Mr. Ingram following the incident. On that form, Mr. Ingram indicated that the damage to the M/V DISCOVERY was $225,000. Fishbones argues that at the time Mr. Ingram supplied that figure, he was not aware that the vessel was a total loss. The vessel was only partially submerged, and Mr. Ingram thought that he would only have to replace the first floor and engine room.
The court again noted that Mr. Ingram was not shown to possess any expertise in valuing vessels, and therefore, the court gave little weight to this piece of evidence.
|19After considering all of the above factors, the trial court arrived at the replacement value of the vessel at $250,000.[3] Considering the obvious efforts of the trial court in fairly evaluating and weighing the evidence, and in applying the correct standards as established by case law, we cannot say that the trial court was manifestly erroneous in determining the replacement value.
Accordingly, we affirm the judgment of the trial court in its entirety.
AFFIRMED.

. In its reasons for judgment, the trial court noted that the actual date of the incident was May 5, 2001, not May 5, 2000, as stated in the written stipulations.

. During oral argument, J. Tobias suggested that the parties review the recent opinion rendered in Shofstahl v. Bd. of Commissioners for Orleans Levee District, 2002-0018 (La.App. 4 Cir. 1/15/03), 841 So.2d 1, and to file post-argument briefs. After reviewing the briefs *809 submitted, we stand firm in our holding that only maritime law applies to the facts of this case.

. The difference between the $275,000 awarded and the vessel value is the value of the lost contents of the vessel.